## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTHONY J. BONOMO, and<br>MARY ELLEN BONOMO | : | |
| | : | |
| | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | NO._____ |
| | : | |
| NOVA FINANCIAL HOLDINGS, INC. | : | |
| | : | |
| Defendant. | : | |

### COMPLAINT

Plaintiffs, Anthony J. and Mary Ellen Bonomo ("Plaintiffs"), by way of

Complaint against defendant Nova Financial Holdings, Inc. ("Nova"), hereby allege and say as

follows:

### THE PARTIES

1.      Plaintiff, Anthony J. Bonomo ("Bonomo"), is an individual residing at 10

Walter Lane, Manhasset, New York 11030.

2.      Plaintiff, Mary Ellen Bonomo, is an individual residing at 10 Walter Lane,

Manhasset, New York 11030 and the wife of Anthony J. Bonomo (where no distinction is

necessary, Bonomo and Mary Ellen Bonomo are collectively referenced to as "Plaintiffs").

3.      Defendant, Nova Financial Holdings, Inc. ("Nova"), is Pennsylvania

corporation and a registered bank holding company having it principal place of business at 1235

Westlakes Drive, Suite 420, Berwyn, PA 19312.

### JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331

because some of the claims herein arise under the laws of the United States.  This Court also has

jurisdiction pursuant to 28 U.S.C. §1332 because the matter in controversy exceeds the sum of

$75,000.00, exclusive of interest and costs, and the claims are between citizens of different

states, there being complete diversity of citizenship.  This Court also has supplemental

jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a) because the

state law claims are so related to the claims under the laws of the United States that they form

part of the same case or controversy under Article III of the United States Constitution.

       5.      This Court has personal jurisdiction over Nova because it is a

Pennsylvania corporation with its principal place of business in Pennsylvania.

       6.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)

because defendants are subject to personal jurisdiction in this district and a substantial part of the

events or omissions giving rise to the claims herein occurred in this district.

FACTS

The Formation of Nova

       7.      In 2002, Barry Bekkedam ("Bekkedam") organized and founded Nova to

acquire USABancShares.com, Inc. in a merger that closed on October 31, 2002.

       8.      Nova operates as a bank holding company with its primary activity being

derived from the operation of its two wholly owned subsidiaries, Nova Bank (the "Bank") and

NOVA Capital Trust I, a Delaware business trust.

       9.      From approximately 1998 to 2010, Bekkedam owned and operated

Ballamor Capital Management (Ballamor").  Ballamor offers financial advisory services

including asset management and financial planning.  Its primary clients are high net worth

individuals.

10.     Bekkedam was the initial Chairman of Nova and raised virtually all of Nova's capital from investment advisory clients of Ballamor.  At all relevant times, Brian Hartline ("Hartline") was the President of Nova.

11.     Bekkedam resigned from the NOVA Financial Board of Directors around 2004 because of regulatory issues affecting his ability to control both Ballamor, a registered investment advisor, and Nova, a regulated bank holding company.

12.     Notwithstanding his resignation, Bekkedam continued to exercise control over the management of Nova.  Virtually all of Nova's stock was owned by investment advisory clients of Ballamor.  In addition, Bekkedam arranged for Ed DiMarcantonio, his long-time friend and business partner in other ventures, to serve as the Chairman of Nova.

13.     Despite his resignation, Bekkedam continued to represent that he controlled Nova.

### Bekkedam's Relationship with AJB and Bonomo

14.     Bonomo is the controlling stockholder and CEO of AJB Ventures, Inc. ("AJB").

15.     In 2006, Ballamor formed two partnerships comprised of Ballamor investment advisory clients to loan AJB money to finance AJB's acquisition of an insurance management company.

16.     Prior to the acquisition, Bonomo and AJB became investment advisory clients of Ballamor and Bekkedam became a director of AJB.

17.     Until early 2010, Ballamor and Bekkedam were the exclusive investment advisors for Bonomo and managed or directed investment of all assets of AJB and its affiliates.

The June 2009 Offering

18.     At sometime prior to June 2009, Nova lost its "well capitalized" status for regulatory purposes and federal bank regulators imposed requirements that it raise more capital in order to be in compliance with applicable bank regulations.

19.     In or about June 2009, Nova commenced an offering for 2,700,000 shares of its common stock at a price of $11.00 (the "June Offering") per share pursuant to a Confidential Private Placement Memorandum dated June 30, 2009 (the "June PPM").  The stated purpose of the offering was, among other things, to increase Nova's capital ratios for regulatory compliance and to finance acquisitions of Delaware Valley Financial Group ("DFVG") and AFC First Financial Corporation ("AFC") (jointly, the "Proposed Acquisitions").

20.     Nova anticipated that most of the shares offered via the June PPM would be purchased by George G. Levin ("Levin").

21.     Levin had purchased $5,000,000 of Nova stock in June 2009.  Levin purchased the maximum number of shares that he was permitted to purchase at that time without regulatory approval.

22.     Levin was the managing member of the general partner of Banyon Income Fund II, L.P. ("Banyon").  Banyon was a limited partnership formed to acquire structured settlements from clients of a Florida law firm controlled by Scott Rothstein ("Rothstein").

Plaintiffs' Investment In Nova

23.     In the fall of 2009, Bekkedam called Bonomo and told him that he wanted Bonomo to invest a total $4,500,000 in Nova and Banyon.

24.     Bekkedam provided Bonomo with a copy of the June PPM.

25.     In addition, Bekkedam orally advised Bonomo about Levin's soon-to-be substantial investment in Nova, the elimination of Nova's undercapitalization problems, and the

profits Nova would derive from the Proposed Acquisitions.  Bekkedam aggressively encouraged Bonomo to invest in Nova.

26.     Bekkedam further advised Bonomo that Levin's purchase of a controlling stake in Nova was approved by bank regulators.

27.     Bonomo advised Bekkedam that he did not have $4,500,000 to make the investment Bekkedam was proposing.  Bekkedam's solution was to direct the Bank to loan Bonomo the money for the investment.

28.     Bonomo did not contact the Bank to seek a loan; instead, Bekkedam made arrangements with the Bank to loan Bonomo $4,500,000 (the "Loan").

29.     Bekkedam strongly advised Bonomo to take the Loan and to sign the subscription agreements in connection with the June PPM.

30.     The Loan closing occurred by fax and mail in late October or early November 2009.  $2,000,000 of the Loan proceeds were wired to a Banyon escrow account the next day while the balance of the Loan proceeds were transferred to the Bank to fund Plaintiffs' subscription for Nova shares.

31.     Plaintiffs invested $2,500,000 for Nova shares at $11 per share.

32.     The June Offering closed on October 30, 2009.

33.     Before the close of the June Offering on October 30, 2009, Hartline, Bekkedam and Levin learned that Rothstein was operating a Ponzi scheme involving Banyon. As a result of the impending public disclosure of the Ponzi scheme, Levin did not purchase Nova stock in the June Offering.

34.     Nova did not tell Plaintiffs that Levin would not be investing any money in the June Offering.

35.     Within days of the closing of the Nova June Offering, newspapers reported that the FBI had raided the law firm controlled by Rothstein and that the structured settlements sold to Banyon were part of a "Ponzi scheme."

36.     The June Offering raised only $5,300,000 out of the total of $29,700,000 that Nova and Bekkedam sought to raise.  Plaintiffs' $2,500,000 investment represented almost 50% of the stock sold in the June Offering.

37.     It was not until after the close of the June Offering that Bekkedam told Bonomo that Plaintiffs' investment was worthless, that Nova had suffered significant losses and that Nova needed to raise significant new equity.

### The November Offering

38.     Seventeen days after the closing of the June Offering, Nova began a new stock offering (the "November Offering") pursuant to a Confidential Private Placement Memorandum dated November 16, 2009 (the "November PPM").

39.     In the November Offering, Nova offered to sell up to 2,000,000 shares at $4.00 per share, the purpose of which was to satisfy the conditions for a separate issuance of its preferred stock to the United States Treasury under its "TARP" program for $17,000,000.

40.     The November PPM, unlike the June PPM, characterized Nova's financial condition as weak including recognizing that Nova had experienced a significant increase in non-performing loans and assets and a significant decrease in net income.

41.     The issuance price offered in the November Offering was $4.00, over 60% less than the June Offering price.

42.     The November Offering disclosed a $20.6 million unrealized loss.

43.     The November Offering made no mention of the DFVG and AFC acquisitions, which were abandoned and never occurred.

44.     The November Offering also affirmatively acknowledged that a large investor who had subscribed to enough shares that would have enabled Nova to exceed its capital contingency with the Treasury was unable to fulfill his subscription obligation.  It further noted that there was no assurance that the Treasury would complete the purchase of the senior cumulative preferred stock.

<u>Nova's Misrepresentations & Omissions</u>

45.     At all times, Bekkedam was acting on behalf of Nova and his statements and omissions can be attributed to Nova.  Specifically Bekkedam:

>     a.     was the original Chairman of Nova;
>
>     b.     personally raised all of the equity for Nova;
>
>     c.     negotiated the proposed DVFG and AFC acquisitions;
>
>     d.     regularly met with and talked to Hartline about Bank matters;
>
>     e.     maintained his personal and Ballamor accounts at the Bank;
>
>     f.     arranged for Levin to invest $5,000,000 into Nova and to subscribe

for an additional $13,000,000 as a quid pro quo for Bekkedam raising $40,000,000 for Levin's Banyon fund;

>     g.     was the investment advisor for substantially all of Nova's

investors;

>     h.     was focused on protecting his clients' substantial investments in

Nova which were jeopardized by the materially adverse financial performance of the Bank, as well as bank regulatory action;

>     i.     was concerned that the failure of Nova would destroy Ballamor;
>
>     j.     solicited and was substantially involved in Plaintiffs' purchase of

stock in the June offering;

        k.        made all arrangements for the Loan to Plaintiffs and without the normal due diligence for a multi-million dollar loan.

        46.      Material developments occurred prior to the October 30, 2009 closing of the June Offering that adversely affected Nova and made the information disclosed in the June PPM materially misleading.

        47.      The material developments were not disclosed to Plaintiffs prior to their acceptance of the subscription and purchase of stock.  Nova's failure to correct the statements contained in the June PPM rendered those statements false and misleading

        48.      Prior to Plaintiffs' investment and the closing of the June Offering, Nova failed to disclose:

        a.        massive write-downs of Bank investments required by bank regulators, classifying substantial amounts of loans as "impaired," and requiring significant increases to loan loss reserves;

        b.        materially adverse financial results through September 30, 2009, including substantial net losses, material reduction in total assets and stockholders equity, and material increases in non-performing loans and assets;

        c.        that Levin, the investor expected to provide majority of funding for Nova in the June Offering, defaulted on his subscription obligation;

        d.        Nova had determined that it would not to purchase DVFG or AFC, both acquisitions prominently mentioned in the June PPM, because it lacked the capital necessary to do so; and

        e.        that the June Offering had been completely unsuccessful and the investments amount pledged were far less than the anticipated amounts.

49.     Nova and Hartline were aware of Bekkedam's material misstatements and omissions to Bonomo, as well as the material misstatements in the June PPM.

50.     Nova did not disclose or correct its prior statements because it knew investors would not subscribe to the June Offering if they were aware of the true financial condition of Nova.

51.     The facts and developments withheld by Nova are information a reasonable investor would have wanted to know prior to making an investment.

52.     Plaintiffs would not have purchased any shares of Nova but for Nova's material misrepresentations and omissions.

53.     On August 21, 2010, Plaintiffs' counsel sent a letter to Hartline demanding a rescission of Plaintiffs' investment in Nova.  Nova rejected this demand.

COUNT ONE
Violation of Section 10(b) of the Exchange Act and Rule 10b-5

54.     Plaintiffs incorporate by reference paragraphs 1-53, as fully set forth herein.

55.     Nova intended that Plaintiffs rely upon statements in the June PPM and statements made by Bekkedam on behalf of Nova.

56.     Plaintiffs did reasonably rely on such statements and were damaged as a result.

57.     Bekkedam, acting on behalf of and at the insistence of Nova, made misrepresentations to Plaintiffs that resulted in Plaintiffs obtaining the Loan from the Bank for the purpose of purchasing stock for the June Offering.

58.     Bekkedam made these intentional misrepresentations to Plaintiffs with the express, implied, inherent and/or apparent authority of Nova, and therefore, Nova is bound by his statements.

59.     Further, Nova ratified the fraudulent acts of Bekkedam by accepting the benefits of his false promises to the investors, namely, accepting Plaintiffs' funds.

60.     The law does not allow Nova to accept the benefits of the fraudulent conduct that allowed them access to the investors' funds, and at the same time, avoid liability created by the misrepresentations that induced the investors to act.

61.     The misrepresentations and omissions identified above were made in connection with the sale of securities by Nova to Plaintiffs, and in so doing, Nova employed the means and instrumentalities of interstate commerce and communication.

62.     Nova acted with *scienter* in making the foregoing misrepresentations and omissions.

63.     Nova intended that the Plaintiffs rely, and the Plaintiffs did reasonably rely, on the misrepresentations made on behalf of Nova, and were damaged as a result.

64.     Therefore, Nova, in connection with the purchase or sale of securities and in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder:

        a.      employed a device, scheme, or artifice to defraud Plaintiffs;

        b.      made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under with they were made, not misleading; and

          c.       engaged in acts, practices, or courses of business that operated or would operate as a fraud or deceit upon Plaintiffs, in connection with the purchase or sale of a security.

65.     Nova's misrepresentations and omissions, as detailed above, were material.

66.     As a direct and proximate result of Nova's conduct, Plaintiffs were damaged.

67.     All of the above acts were in violation of federal law is liable to Plaintiffs for damages caused by the violations.

WHEREFORE, Plaintiffs demand that judgment be entered in their favor against Nova, as follows:

(1) a determination that Plaintiffs' subscription to the June Offering is rescinded and an order directing Defendant to pay restitution to the Plaintiffs in the amount of $2,500,000 plus interest;

(2) for compensatory damages in an amount in excess of $2,500,000, together with interest, penalties, treble damages, costs of suit, counsel fees and other such relief as this Court deems just, proper and equitable.

COUNT TWO
Unjust Enrichment

68.     Plaintiffs incorporate by reference paragraphs 1-67, as if fully set forth herein.

69.     Plaintiffs invested in Nova based on the misrepresentations about Levin's investments, the Proposed Acquisitions and Nova's financial health contained in the June PPM,

the misstatements made by Bekkedam on Nova's behalf, and loan from Nova Bank orchestrated by Bekkedam.

70.     Nova knew that the only reason Plaintiffs invested in Nova was the misrepresentations and omissions made by Nova.

71.     Nova knew that Levin was not going to invest in it and knew that its financial condition had declined significantly since the issuance of the June PPM, but withheld this information from the Plaintiffs.

72.     Unaware of the changed circumstances, Plaintiffs invested in Nova and Nova obtained the use of Plaintiffs' funds to increase its capital ratios for regulatory compliance.

73.     The Plaintiffs demanded a return of those funds when it learned of Nova's misrepresentations.

74.     Nova has wrongfully refused to return Plaintiffs' funds.

75.     Nova has taken monies from Plaintiffs for its use and benefit, to the detriment of Plaintiffs.

76.     By retaining Plaintiffs' funds, Nova has been unjustly enriched and allowing it to retain such funds would be unjust and inequitable.

WHEREFORE, Plaintiffs demand that judgment be entered in their favor against Nova, as follows:

(1) a determination that Plaintiffs' subscription to the June Offering is rescinded and an order directing Defendant to pay restitution to the Plaintiffs in the amount of $2,500,000 plus interest;

(2) for compensatory damages in an amount in excess of $2,500,000, together with interest, costs of suit, counsel fees and other such relief as this Court deems just, proper and equitable.

COUNT THREE<br>Fraud

77.     Plaintiff incorporate by reference paragraphs 1-76, as if fully set forth herein.

78.     Nova made multiple false or misleading statements in the information that they provided to Plaintiffs in order to induce Plaintiffs to invest in Nova.

79.     Nova made these misrepresentations knowing they were false and/or with reckless or negligent disregard for their truth.

80.     Nova intended Plaintiffs to rely upon its misrepresentations.

81.     Plaintiffs, relied upon the misrepresentations made to them, which reliance caused injury to Plaintiffs.

82.     As a result of the fraud, Nova is liable to Plaintiffs for the full amount of the damages they have incurred plus punitive damages.

WHEREFORE, Plaintiffs demand that judgment be entered in their favor against Nova, as follows:

(1) a determination that Plaintiffs' subscription to the June Offering is rescinded and an order directing Defendant to pay restitution to the Plaintiffs in the amount of $2,500,000 plus interest;

(2) for compensatory damages in an amount in excess of $2,500,000, together with interest, penalties, treble damages, costs of suit, counsel fees and other such relief as this Court deems just, proper and equitable.

-14-

Dated: July 28, 2011

Respectfully submitted,


*s/ Michael S. Hino*
Michael S. Hino
PEPPER HAMILTON LLP
400 Berwyn Park
899 Cassatt Road
Berwyn, PA 191312-1183
(610) 640-7800

Deirdre E. McInerney
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

Attorneys for Plaintiffs