**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANTHONY J. BONOMO, and | : | |
| MARY ELLEN BONOMO, | : | CIVIL ACTION |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| NOVA FINANCIAL HOLDINGS, INC., | : | |
| | : | NO. 11-4762 |
| Defendant. | : | |

**M E M O R A N D U M**

GENE E.K. PRATTER, J.,                                              JUNE 14, 2012

## I.    INTRODUCTION

Anthony and Mary Ellen Bonomo accuse NOVA Financial Holdings, Inc. ("NOVA") of committing securities fraud and common law fraud, and being unjustly enriched as a result of the Bonomos's failed investment in NOVA's June 2009 private stock offering.  The Bonomos contend that NOVA and Barry Bekkedam, their investment advisor and NOVA's agent, had a duty to update them on materially adverse developments, the failure to do so having then rendered statements by Mr. Bekkedam and in NOVA's offering memorandum materially misleading.  They contend that NOVA and Mr. Bekkedam consciously chose not to inform them of these developments in violation of their duty so that the Bonomos would continue in their decision to invest in the ultimately failed offering prior to its close.

1

NOVA filed a motion to dismiss pursuant to Rule 12(b)(6).  For the reasons that follow, the Court grants NOVA's motion without prejudice to the Bonomos to attempt, reasonably, to overcome the flaws in this pleading.

## II.   FACTS

Barry Bekkedam owns and operates Ballamor Capital Management ("Ballamor"), a company that offers financial planning and asset management services to high net worth individuals.  Compl. ¶ 9.  Since 2006, Plaintiff Anthony Bonomo and AJB Ventures, Inc. ("AJB"), the company for which Mr. Bonomo is the controlling shareholder and CEO, became Mr. Bekkedam's investment clients at Ballamor, and Mr. Bekkedam became a director of AJB. Id. ¶¶ 14, 16.  Shortly after this relationship began, Ballamor assisted AJB in raising funds – primarily from Ballamor clients – for its acquisition of an insurance management company.  Id. ¶ 15.  Until early 2010, Ballamor and Mr. Bekkedam served as the exclusive investment advisors for Mr. Bonomo and managed or directed investment of all assets of AJB and its affiliates.  Id. ¶ 17.

In 2002, Mr. Bekkedam also founded NOVA Financial Holdings, Inc. ("NOVA"), a holding company for Nova Bank and Nova Capital Trust I.  Id. ¶¶ 7-8.  Mr. Bekkedam served as Chairman for the first two years of NOVA's existence, and raised the vast majority of NOVA's capital from his investment advisory clients at Ballamor.  Id. ¶ 10.  Mr. Bekkedam resigned from the NOVA Board of Directors in 2004 due to regulatory issues related to his control of both Ballamor, a registered investment advisor, and NOVA, a regulated bank holding company.  Id. ¶ 11.  In spite of his resignation, Mr. Bonomo alleges that Mr. Bekkedam maintained control, and

represented that he maintained control, over the management of NOVA.[1]  Id. ¶¶ 12-13.  Indeed, almost all of NOVA's stock was owned by investment advisory clients of Ballamor.  Id. ¶ 12.  Also, Mr. Bekkedam's long-time friend and business-partner, Ed DiMarcantonio, replaced him as Chairman of NOVA.  Id.

In June 2009, NOVA commenced an offering of 2.7 million shares of its common stock at a price of $11 per share (the "June Offering") pursuant to a Confidential Private Placement Memorandum (the "June PPM") with the goal of raising $29.7 million.  Id. ¶ 19.  The stated goals of the offering were "to regain a well capitalized status" in order to remain in compliance with new federal bank regulations, and to finance the acquisitions of the Delaware Valley Financial Group ("DVFG") and AFC First Financial Corporation ("AFC").  Id. ¶ 18; June PPM at 2.  The June Offering was set to expire on September 30, 2009, but the June PPM, attached to NOVA's motion to dismiss, provided that the Offering could be extended at the company's discretion in 30-day increments.  June PPM at 2.

The June PPM contained extensive cautionary language to alert potential investors of the "high degree of risk" of investing in the June Offering.  Id. at 4, 9.  For example, it cautioned that only those who could afford "loss of their entire investment" should consider investment.  Id.  Moreover, it warned that the company had "not been profitable for a fiscal year since [it] formed the Company in 2002" and warned that it "is currently not considered 'well capitalized by Regulatory standards."  Id. at 16, 18-19.  It also cautioned that both transactions were "subject to all required regulatory approvals and [acquired company] shareholder approval . . ." and that

---

[1] Brian Hartline served as President of NOVA at all relevant times.  Compl. ¶ 10.

there was "no guarantee that [it] will be successful in completing the acquisition of [DVFG and AFC] . . . ." Id. at 16-17 (emphasis omitted).

Likewise, the June PPM cautioned about unduly relying on forward looking statements within the document, and expressly disclaimed any obligation to update forward-looking statements to reflect unanticipated events after the date of such statements. Id. at 6. It also noted that the offering price for the shares was established by the company arbitrarily and that "[t]here is no minimum number of Shares that must be sold in order for the Company to make the offering effective. You may be the only investor that invests in this offering." See June PPM at 2, 24.

Sometime in the fall of 2009, Mr. Bekkedam approached Mr. Bonomo and proposed that he invest $4.5 million in the June Offering. Compl. ¶ 23. Mr. Bekkedam provided Mr. Bonomo with the June PPM and allegedly advised Mr. Bonomo orally that George G. Levin, the managing member of the general partner of Banyon Income Fund II, L.P. ("Banyon"), intended to make a "substantial investment in NOVA," and that Mr. Levin's purchase of a controlling stake in NOVA had been approved by bank regulators.[3] Id. ¶¶ 25, 26. Mr. Bekkedam also advised Mr. Bonomo of the "soon-to-be resolved undercapitalization problems, and the profits NOVA would derive from the proposed acquisitions" of AFC and DVFG. Id. ¶ 25.

Although Mr. Bonomo allegedly told Mr. Bekkedam that he did not have $4.5 million to invest, Mr. Bekkedam was adamant, and directed Nova Bank to loan Mr. Bonomo the money for the investment. Id. ¶¶ 27-29. At Mr. Bekkedam's urging, the loan allegedly closed by fax and

---

[3] Banyon was a limited partnership formed to acquire structured settlements from clients of a Florida law firm controlled by Scott Rothstein. Compl. ¶ 22. The June PPM makes no mention, however, of Mr. Levin or his planned investment.

mail in "late October or early November 2009," and Mr. Bonomo signed a subscription agreement to purchase shares in the offering on October 30, 2009.[1]  Id. ¶¶ 29-30; NOVA Ex. B. Two million dollars of the loan was sent to a Banyon escrow account while the balance of the loan proceeds were transferred to the Bank to fund Mr. Bonomo's purchase of NOVA shares at $11 per share.  Id. ¶¶ 30-31.  The June Offering closed on October 30, 2009, the same day that Mr. Bonomo signed the subscription agreement.  Id. ¶ 32.

The Bonomos allege that prior to the close of the June Offering, Messrs. Hartline, Bekkedam, and Levin learned that Mr. Rothstein had been operating a Ponzi scheme involving Banyon, and due to the impending public disclosure of the scheme, Mr. Levin opted not to purchase NOVA stock in the June Offering.  Id. ¶ 33.  However, NOVA did not inform Mr. Bonomo that Mr. Levin had pulled out of the June Offering.  Id. ¶ 34.  Shortly after the closing of the June Offering, media outlets reported that the FBI had raided Mr. Rothstein's law offices and that the structured settlements sold to Banyon were part of the Ponzi scheme.  Id. ¶ 35.  As a result of Mr. Levin's decision not to invest, the June Offering only raised $5.3 million of the targeted maximum of $29.7 million.  Id. ¶ 36.  Only after the close of the June Offering did Mr. Bekkedam allegedly inform Mr. Bonomo that his "investment was worthless" and NOVA would need to raise new equity.  Id. ¶ 37.

On November 16, 2009, NOVA began a new stock offering, (the "November Offering") of up to 2 million shares valued at $4 per share pursuant to a November PPM.  Id. ¶¶ 38-39.  The

---

[1] The subscription agreement explicitly provides that the subscription "is subject to the terms and conditions of the Offering which are fully described in the Offering Memorandum [the June PPM] to which reference is made.  The subscriber hereby acknowledges and agrees that such subscriber is only relying on information set forth in such Offering Memorandum and no other document."  Subscription Agreement A-2.

purpose of this second offering was to satisfy the conditions for a separate issuance of preferred stock to the United States Treasury under its Troubled Asset Relief Program ("TARP") for $17 million.  Id. ¶ 39.  The November PPM described NOVA's financial condition as weak, disclosed a $20.6 million unrealized loss, made no mention of the planned acquisitions of DVFG or AFC, and acknowledged that a large investor was unable to fulfill his subscription obligation. Id. ¶¶ 40-44.  The Bonomos allege that this large investor was Mr. Levin.

Mr. and Mrs. Bonomo filed a complaint against NOVA alleging securities fraud under Section 10(b) of the Securities Exchange Act and Rule 10b-5, common law fraud, and unjust enrichment.  The Bonomos complaint seeks restitution in the amount of $2.5 million (plus interest), as well as compensatory damages in excess of $2.5 million, with interest, penalties, treble damages, costs of suit, and attorney's fees.

Now before the Court is NOVA's Motion to Dismiss (Doc. No. 11) for failure to state a claim upon which relief can be granted.

## III.   LEGAL STANDARD

### A.  Rule 12(b)(6)

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  Although Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,"  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 553-55 (2007) (quoting Conley, 355 U.S. at 47), the plaintiff must provide "more than labels and conclusions,

and a formulaic recitation of the elements of a cause of action will not do." Id. (citations omitted).  Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. at 555 (citations omitted).  To survive a motion to dismiss, a civil complaint must allege "factual content [that] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009) (confirming that Twombly applies to all civil cases).

The Court "must only consider those facts alleged in the complaint and accept all of those allegations as true." ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994) (citing Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)); see also Twombly, 550 U.S. at 555 (stating that courts must assume that "all the allegations in the complaint are true (even if doubtful in fact)"). The Court must also accept as true all reasonable inferences that may be drawn from the allegations, and view those facts and inferences in the light most favorable to the non-moving party. Rocks v. Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989).  The Court, however, need not accept as true "unsupported conclusions and unwarranted inferences," Doug Grant, Inc. v. Greate Bay Casino Corp., 232 F.3d 173, 183-84 (3d Cir. 2000) (citing City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 263 n.13 (3d Cir. 1998)), or the plaintiff's "bald assertions" or "legal conclusions." Morse v. Lower Merion Sch. Dist., 132 F.3d. 902, 906 (3d Cir. 1997).

The Court may consider the allegations contained in the complaint, exhibits attached to the complaint, matters of public record and records of which the Court may take judicial notice. See Tellabs, Inc. v. Makor Issues & Rts., 551 U.S. 308, 322 (2007); Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993).

**B.  Rule 9(b)**

"In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).  Pleading "particularity" does not require the plaintiff to "plead the date, place or time of the fraud, so long as they use an alternative means of injecting precision and some measure of substantiation into their allegations of fraud." Rolo v. City Invest. Co. Liquidating Trust, 155 F.3d 644, 658 (3d Cir. 1998), abrogation on other grounds recognized, Forbes v. Eagleson, 228 F.3d 471 (3d Cir. 2000).  While the purpose of Rule 9(b) is to provide notice of the precise misconduct, courts "should apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by defendants."  Id.   The Third Circuit Court of Appeals has cautioned against focusing exclusively on Rule 9(b)'s particularity language because such a focus is "too narrow an approach [that] fails to take account of the general simplicity and flexibility contemplated by the rules."  Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984).  Instead, the court should focus on whether the complaint "adequately describes the nature and subject of the alleged misrepresentation."  Id.

**III.    DISCUSSION**

**A.  Securities Fraud under Section 10(b) and Rule 10b-5**

The Bonomos allege that NOVA violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  To pursue a private right of action under Section 10(b) and Rule 10b-5 a plaintiff must plead with particularity (1) a material misrepresentation or omission; (2)

scienter (i.e., a wrongful state of mind); (3) a connection with the purchase or sale of a security;
(4) reliance on the misrepresentation or omission; (5) economic loss; and (6) loss causation (i.e.,
a causal connection between the misrepresentation or omission and the loss). McCabe v. Ernst &
Young, 494 F.3d 418, 424 (3d Cir. 2007) (citing Dura Pharms., Inc. v. Broudo, 544 U.S. 336,
341-42 (2005). In addition, where, as in this case, a fraud claim is based upon the alleged
nondisclosure of information, there can be no finding of fraud if the corporation was under no
duty to disclose the information. See Chiarella v. United States, 445 U.S. 222, 228 (1980).

All federal securities fraud litigation is governed by the Private Securities Litigation
Reform Act of 1995 ("PSLRA"), which Congress enacted "[a]s a check against abusive litigation
by private parties . . . ." Tellabs, 551 U.S. at 313. The PSLRA imposes two "exacting and
distinct" pleading requirements for securities fraud actions. In re Aetna Sec. Litig., 617 F.3d
272, 277 (3d Cir. 2010). First, "the complaint shall specify each statement alleged to have been
misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding
the statement or omission is made on information and belief, the complaint shall state with
particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1)); Winer Family
Trust v. Queen, 503 F.3d 319, 326 (3d Cir. 2007). Second, "the complaint shall, with respect to
each act or omission alleged to violate this title, state with particularity facts giving rise to a
strong inference that the defendant acted with the required state of mind." 15 U.S.C. §
78u–4(b)(2)).

Both provisions require facts to be pled "with particularity," a requirement that the Third
Circuit Court of Appeals has observed, "echoes precisely Fed. R. Civ. P. 9(b)."[5] Inst. Investors

---

[5] While the special pleading requirements of Fed. R. Civ. P. 9(b) also apply to securities fraud
claims, the PSLRA's requirements with respect to scienter are more stringent than those of Rule

Grp. v. Avaya, Inc., 564 F.3d 242, 253 (3d Cir. 2009) (citing Advanta, 180 F.3d at 534).  This

standard "requires plaintiffs to plead the who, what, when, where and how: the first paragraph of

any newspaper story."  Id.

NOVA argues that the Complaint is deficient on multiple fronts including that it fails to

allege (1) any statements in the June PPM that were false or misleading, (2) NOVA had a duty to

update any statements made in the June PPM, (3) a strong inference of scienter, or (4) the

Bonomos relied on any misleading statements to their detriment.  The Court will analyze these

arguments in turn.

### 1.  Duty to Update

Unlike most Section 10(b) securities fraud actions, the Bonomos do not allege that

NOVA made any statements in the June PPM that were false or misleading at the time they were

made.  To the contrary, the Bonomos allege that (1) NOVA failed to update them on adverse

developments to its business that rendered statements in the June PPM materially misleading,

and (2) Mr. Bekkedam, who the Bonomos claim acted as NOVA's agent,[6] reinforced the

9(b), inasmuch as Rule 9(b) allows state of mind to be alleged generally and the PSLRA requires specific factual pleading.  Gargiulo v. Isolagen, 527 F. Supp. 2d 384, 389-90 (E.D. Pa. 2007) ("[T]he PSLRA's particularity requirement for scienter . . . supersedes Rule 9(b) as it relates to Rule 10b–5 actions"); see also Avaya, 564 F.3d at 253 ("The PSLRA's requirement for pleading scienter . . . marks a sharp break with Rule 9(b).").

[6] At oral argument, counsel for NOVA conceded, as he must, that for the purposes of this motion, the Court must assume that Mr. Bekkedam was acting as NOVA's agent.  OA Tr. at 5-6.  Indeed, the Bonomos have certainly pled sufficient facts for the Court to infer that an agency relationship existed between Mr. Bekkedam and NOVA.  See, e.g., Gizzi v. Texaco, Inc., 437 F.2d 308, 310 (3d Cir. 1971) ("Questions of apparent authority are questions of fact and are therefore for the jury to determine.").  For instance, the Bonomos have alleged that Bekkedam founded NOVA, served as its original Chairman, negotiated the proposed DVFG and AFC acquisitions, raised NOVA's equity, regularly met with Brian Hartline, the President of the company, and continued to assert control over NOVA's management.  Compl. ¶¶ 12-13, 45.  Thus, the Court will treat the statements of Mr. Bekkedam as though they were the statements of NOVA.  Accordingly, the

misleading statements in the June PPM, failed to provide updated information after these statements proved false, and offered additional materially misleading statements that induced the Bonomos to invest in NOVA.[7]  Accordingly, the Bonomos allege, NOVA had a duty to update them on these developments.

According to some, the duty to update "concerns statements that although reasonable at the time made, become misleading when viewed in the context of subsequent events."  Oran v. Stafford, 226 F.3d 275, 286 (3d Cir. 2000) (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1431 (3d Cir. 1997)).  Thus, an original statement that was "reasonable at the time made" must contain an "implicit factual representation that remain[s] 'alive' in the minds of investors as a continuing representation."  United States v. Schiff, 602 F.3d 152, 170 (3d Cir. 2010) (citing Burlington, 114 F.3d at 1432).  In other words, the duty to update touches on forward-looking statements that are rendered materially misleading by intervening events.

The duty to update, however, does not touch on all forward-looking statements.  Indeed, "the law does not impose a duty to update forward-looking statements such as earnings estimates with all relevant material information and/or upon changes in business strategy."  In re Cigna Corp. Sec. Litig., No. 02-8088, 2005 WL 3536212, at *4 (E.D. Pa. Dec. 23, 2005); see also 15 U.S.C. § 78u-5(d) (noting that "[n]othing in this section shall impose upon any person a duty to

---

cautionary language in the June PPM that "no prospective investor should rely upon . . . (b) any additional information (whether oral or written) except for information prepared and delivered to the prospective investor by [NOVA]," for the purposes of this motion, does not insulate NOVA from liability on account of Mr. Bekkedam's statements.  June PPM at 6.

[7] The Complaint, however, does not support the Bonomos's contention that Mr. Bekkedam made affirmative misstatements.  Indeed, at oral argument, counsel for the Bonomos acknowledged that the Complaint only supports a failure to update, but that "as discovery goes maybe we'll learn more."  OA Tr. at 20-21.

update a forward-looking statement").  However, the Third Circuit Court of Appeals has noted

that the duty to update exists in situations where the initial statement concerns "fundamental[]

change[s]" in the nature of the company such as a merger, liquidation, or takeover attempt, and

when subsequent events produce an "extreme" or "radical change" in the continuing validity of

that initial statement.  Burlington, 114 F.3d at 1433-34 n.20; see also Weiner v. Quaker Oats Co.,

129 F.3d 310, 318 (3d Cir. 1997) (holding that a company that had stated its policy to maintain a

stable debt-equity ratio came under a duty to update on negotiations of a merger that would have

added significant new debt); In re Time Warner Securities Litigation, 9 F.3d 259, 267 (2d Cir.

1993) (finding that the public announcement of a plan to find a financial partner to mend over-

leveraged capital structure triggered a duty to update when the company began to consider a

dilutive stock offering as an alternate financing plan); cf. In re Bristol-Myers Squibb Sec. Litig.,

No. 00-1990, 2005 WL 2007004, at *23 (D.N.J. Aug. 17, 2005) ("[E]ven objectively true

statements can be actionable if Plaintiff can sustain its allegations . . . that Defendants failed to

update "true" forward-looking statements that later became inaccurate.").

     Limiting—and seemingly acting in tension with—the duty to update is the statutory safe

harbor provision of the PSLRA.  The PSLRA safe harbor protects certain forward-looking

statements from becoming the basis for Section 10(b) and Rule 10b–5 securities fraud liability.

See 15 U.S.C. § 78u-5(c).  Forward-looking statements, as defined by the PSLRA, include, *inter

alia*, "projections of future performance, plans and objectives for future operations, and

assumptions underlying statements about future financial, economic or operational performance."

Aetna, 617 F.3d at 279; 15 U.S.C. § 78u-5(i)(1).[8]  The safe harbor provision exempts such

---

[8] The PSLRA defines "forward-looking statement" as:

statements from liability provided that they are "(1) identified as such, and accompanied by meaningful cautionary statements; or (2) immaterial; or (3) made without actual knowledge that the statement was false or misleading." Aetna, 617 F.3d at 278-79; see 15 U.S.C. § 78u-5(c)(1).[9]

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1).

[9] The PSLRA safe-harbor provision provides in relevant part:

Except as provided in subsection (b) of this section, in any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) of this section shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—

(A) the forward-looking statement is—
    (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

    (ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement –

The Bonomos allege that in the period between the issuance of the June PPM and when they signed their subscription agreement, the following material developments occurred that non-disclosure of which rendered NOVA's statements in the June PPM materially misleading: (1) NOVA experienced "massive write downs" of Nova Bank investments, (2) NOVA experienced adverse financial results through September 2009, (3) NOVA decided not to acquire AFC and DVFG as described in the June PPM, and (4) Mr. Levin defaulted on his subscription obligation.

The Court will address each of these developments that purportedly triggered a duty to update in turn.

### a.   Write downs and adverse financial results

With respect to the NOVA financial results through 2009 and "the massive write downs of Nova Bank investments," the Court first notes that nowhere in the Complaint do the Bonomos identify a particular statement or statements in the June PPM or elsewhere where NOVA made any representations about its expected financial results or its Bank investments.  Nor will the Court search through the text of the June PPM to find such a representation.  Likewise, the Bonomos have not alleged that Mr. Bekkedam made any representations about Nova Bank

---

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity; was--

    (I) made by or with the approval of an executive officer of that entity; and

    (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1).

14

investments or of NOVA's previous or expected financial results.  To trigger a duty to update, the Bonomos must identify a particular statement made by NOVA that requires updating.  See, e.g., Schiff, 602 F.3d at 170.  Companies need not disclose financial losses or update their investors about financial losses absent a duty to do so.

Regardless, NOVA has identified a great deal of cautionary language in the June PPM that explicitly warns against the precise negative financial results about which the Bonomos now complain.  For instance, the June PPM warned investors that the company had "not been profitable for a fiscal year since [it] formed the Company in 2002" and warned that it "is currently not considered 'well capitalized by Regulatory standards."  June PPM at 18-19.  It further cautioned that its "investment portfolio included securities that, are primarily backed by mortgage securities, including securities that are debt instruments to other financial institutions which are sensitive to variations in interest rate, may result in losses, as well as a continued decline in the economy which may lead to additional credit losses."  Id. at 20.  Finally, NOVA warned that it "could sustain losses if our asset quality deteriorates" and that "increases in our reserve coverage for loan losses, or charge-offs exceeding our then-existing allowance would adversely affect our results of operation."  Id. at 20-21.

In light of the failure of the Bonomos to identify a statement in need of updating and the abundance of cautionary language regarding projected financial results, the Court concludes that NOVA did not have a duty to update the June PPM with regard to its financial results and write downs of investments.

### b. DVFG and AFC acquisitions

As with the financial results and write downs, the Bonomos do not explicitly allege that a particular statement in the June PPM triggered a duty to update. Rather, the Bonomos seem to claim that because two of the four "stated purpose[s] of the offering w[ere] . . . to finance acquisitions of [DVFG] and [AFC]," when NOVA aborted pursuit of the transactions "because it lacked capital to do so," it had a duty to update the Bonomos prior to the close of the offering. Compl. ¶¶ 19, 48(d).

Although the Bonomos do not cite or quote a particular provision of the June PPM that they claim is misleading, reading the Complaint in the light most favorable to the Bonomos, the Court will assume that where the Bonomos allege that the acquisitions were two of the four "stated purpose[s] of the offering," it is referring to the statements on pages 2 and 3 of the June PPM describing the four "intended uses" of the funds raised from the June Offering. The June PPM provides, "Intended uses of the maximum estimated net proceeds of the offering of $29.7 million include but are not limited to: . . . (ii) Approximately $2.0 million for the proposed acquisition of [AFC] . . . (iii) Approximately $3.0 million for the proposed acquisition of [DVFG] . . . ." June PPM at 2. [10]

NOVA argues that these statements in the June PPM are protected by the PSLRA's safe harbor provision because they are forward-looking as defined by the act, and accompanied by

---

[10] In addition, on the very next page, NOVA represented that it "issued a letter of intent to acquire AFC," and that it "entered a definitive agreement to acquire DVFG," both subject to regulatory and shareholder approval. June PPM at 3. However, because the Bonomos have not made any allegations or argument identifying or implicating these statements in any way, the Court will not consider whether such statements are the type of statements that are expected to "remain[] alive in the minds of investors as a continuing representation." See United States v. Schiff, 602 F.3d 152, 170 (3d Cir. 2010). Rather, the Court will consider these statements only as context with which to analyze the statements specifically identified by the Bonomos.

meaningful cautionary statements advising prospective investors of the numerous risks of investing and the multiple factors that could cause NOVA to be unsuccessful in consummating the acquisitions.  See 15 U.S.C. § 78u-5(c).  As an initial matter, the June PPM provides the general disclaimer that it "does not undertake and specifically disclaims any obligation, to update any forward-looking statements to reflect occurrences or unanticipated events or circumstances after the date of such statements."  June PPM at 6.  While this statement standing alone is clearly boilerplate, the June PPM also includes a great deal of other specific and meaningful cautionary language.  With respect to the proposed acquisition of DVFG, the June PPM provides, in relevant part:

- "***There is no guarantee that we will be successful in completing the acquisition of [DVFG]*** . . ."  June PPM at 17 (emphasis in original).

- "The Definitive Agreement [with DVFG] provides a walk away right for either entity if the deal does not close by June 30, 2009.  NOVA cannot acquire DVFG until it regains its "well capitalized status according to regulatory guidelines, and all regulatory approvals are received, which will not occur by June 30, 2009.  However, it is our belief that this closing date deadline will be mutually extended by both parties."  June PPM at 17

- The transaction "is subject to all required regulatory approvals and DVFG shareholder approval."  June PPM at 3.

Likewise, with regards to the proposed acquisition of AFC, the June PPM cautions:

- "***There is no guarantee that we will be successful in completing the acquisition of [AFC]*** . . . ."  June PPM at 17 (emphasis in original).

- "The transaction is subject to all required regulatory approvals and AFC shareholder approval . . . ."  June PPM 3.

Although the June PPM does include the two acquisitions among its four "intended uses," it is quite clear from the text of the June PPM that the acquisitions were entirely dependent upon the offering's primary goal of achieving "well-capitalized status."  Indeed in the same section of the June PPM that NOVA detailed that the acquisitions constituted two of the intended uses of the offering's funds, NOVA explained that assuming the company sold the maximum number of shares, it intended to devote approximately $20 million of the $29.7 million maximum estimated net proceeds to regain well-capitalized status according to regulatory standards.  June PPM at 2.  Only then would it devote the cash required to acquire AFC and DVFG.  June PPM at 9.   In fact, in the section of the June PPM discussing "Risk Factors," the June PPM cautioned:

- "***NOVA is currently not considered 'well capitalized' by Regulatory standards***: If NOVA is not successful in raising capital, NOVA may be exposed to regulatory sanctions for a period of time or until it increases its capital levels enough to regain its 'well capitalized' status.  These sanctions may include, but are not limited to NOVA not being able to obtain approval to close the current proposed acquisitions."  June PPM at 18 (emphasis in original).

- "There can be no assurance that we will raise the maximum proceeds, or any proceeds, from this offering in a timely fashion if at all."  June PPM at 23.

These detailed cautionary statements about the prospective and conditional nature of the proposed acquisitions are ubiquitous in the June PPM.   Accordingly, these warnings constitute "meaningful cautionary statements" and, assuming that there is no superceding duty to update, would qualify for protection under the PSLRA safe harbor provision.  See 15 U.S.C. § 78u-5(c)(1).

The Bonomos argue, however, that despite these cautionary statements in the June PPM, at the time the Bonomos invested NOVA knew that its statements were not true and would not

materialize, and that therefore the cautionary language in the June PPM cannot insulate it from a duty to update statements that were false in fact.  Bonomo Opp. at 9.  In support of this proposition, they argue that in <u>SEC v. Tecumseh Holdings Corp</u>, Judge Scheindlin of the Southern District of New York held that, "cautionary words about future risk [cannot] insulate from liability the failure to disclose that the *risk [has] transpired*."  765 F. Supp. 2d 340, 352 (S.D.N.Y. 2011) (emphasis in original) (quoting <u>Rombach v. Chang</u>, 355 F.3d 164, 173 (2d Cir. 2004)).  Although the <u>Tecumseh</u> Court did so hold, the facts of that case are distinguishable from this case.

In <u>Tecumseh</u>, the district court found that cautionary language did not insulate Tecumseh from liability where it had been distributing for two years offering memoranda that contained materially false profit projections.  <u>Id</u>. at 352.  In a September 2001 offering memorandum, Tecumseh made profit projections of $8 million, $12 million, and $17 million over its next three years respectively, and incorporated these projections by reference into three subsequent public offering memoranda over approximately the next two years.  <u>Id</u>. at 346.  However, at the time Tecumseh made these projections, the company was operating at a loss and had recorded only net operating losses since its inception.  <u>Id</u>. at 347.  The Court held that Tecumseh made material misstatements because only months after making these profit projections, the company was on track to record a net loss of over $850,000 for the year, yet continued distributing new offering memoranda incorporating the original profit projections.  <u>Id</u>.  Thus, with respect to the quoted language, the Court held that the disclaimers contained in the offering memoranda about future risk did not shield Tecumseh from liability because they knew at the time they incorporated the

statements into the subsequent offerings that they were false.  In other words, <u>Tecumseh</u> dealt with an abject fraud, not a failure to update.

Here, nowhere in the Complaint do the Bonomos allege, as they argue in their opposition brief, that "even assuming the statements in the June PPM were accurate when they were made in June 2009, . . . <u>by the time Nova provided the June PPM to them</u> . . . Nova knew it would not purchase DVFG or AFC."  Bonomo Opp. at 7 (emphasis added).  Had the Bonomos actually made such an allegation (i.e., that sometime between the issuance of the June PPM and when they were given the June PPM, NOVA learned that the DVFG and the AFC acquisitions would not occur but continued to circulate the June PPM), the statement of the <u>Tecumseh</u> Court could arguably apply to the statements in the June PPM.  However, that is not the case.

Even if the Court were to assume that the cautionary language of the June PPM does not shield NOVA from a duty to update, as pled, the allegations of the Complaint are vague and non-particular with respect to when NOVA's purported duty to update arose.  Specifically, the Bonomos allege:

- Mr. Bekkedam provided Mr. Bonomo with a copy of the June PPM "in the fall of 2009."  Compl. ¶ 23.

- NOVA determined it would not purchase DVFG or AFC "prior to Plaintiffs' investment and the closing of the June Offering."  <u>Id</u>. ¶ 48.

- The Bonomos executed their Subscription Agreement on October 30, 2009.  NOVA Ex. B.

- The "June Offering closed on October 30, 2009."  Compl. ¶ 32.

- The loan closing occurred "in late October or early November 2009."  <u>Id</u>. ¶ 30.

It is unclear from the Complaint (1) how much time elapsed between Mr. Bonomo receiving a copy of the June PPM and his October 30, 2009 investment, and (2) how much time elapsed between NOVA determining it would not pursue the acquisitions and Mr. Bonomo's October 30, 2009 investment.  All the Bonomos allege is that NOVA determined it would not acquire DVFG and AFC "prior to Plaintiffs' investment and the closing of the June Offering." June PPM at 48 (emphasis added).  These allegations do not put NOVA on notice of precisely when its purported duty to update arose.

In an effort to add more precision to the allegation, at oral argument, counsel for the Bonomos asserted that the duty to update arose "at or immediately before the time [his] client signed off."  OA Tr. at 22.   However, counsel's representation is merely a statement of intended clarification without clarity.    In this context, the phrase "at or immediately before" is essentially as imprecise as its predecessor "prior to."  It remains unclear whether NOVA's duty to update arose weeks, days, or even minutes before the Bonomos executed the subscription agreement.  In other words, counsel's representation that the duty to update arose "at or immediately before" rather than "prior to" the Bonomos signed their subscription agreement fails to add the requisite particularity to state a claim under the PSLRA. [11]

---

[11] The same can be said for Mr. Bekkedam's oral statements to Mr. Bonomo about the DVFG and AFC acquisitions when he first solicited Mr. Bonomo's investment.  There is no allegation that Mr. Bekkedam knew NOVA would not acquire the DVFG and AFC at the time he made his statement about the "profits NOVA would derive from the proposed acquisitions."  Compl. ¶ 24. Regardless, it is unclear what about "the profits NOVA would derive from the proposed acquisitions" Mr. Bekkedam told Mr. Bonomo other than perhaps that NOVA would derive profits from the acquisitions.  However, the Court will not speculate as to precisely what Mr. Bekkedam communicated to Mr. Bonomo.  Absent more specific allegations about the nature of Mr. Bekkedam's statements, the Court cannot find that NOVA had a duty to update Mr. Bekkedam's statements.

### c.     Mr. Levin's default on the subscription

Finally, the Bonomos allege that NOVA had a duty to update them that Mr. Levin defaulted on his subscription.  The Bonomos base this claim not on any statement made in the June PPM, but on Mr. Bekkedam's oral statements from when he first approached Mr. Bonomo about investing in NOVA.  Mr. Bekkedam allegedly advised Mr. Bonomo orally that (1) Mr. Levin intended to make a substantial investment in NOVA, Compl. ¶ 25, (2) Mr. Levin's purchase of a controlling stake in NOVA had been approved by bank regulators, Id. ¶ 26, and (3) NOVA's undercapitalization problems would soon be resolved.  Id. ¶ 25.

The Bonomos allege that in the period between when Mr. Bekkedam made these statements in the fall of 2009 and when the Bonomos purchased shares on October 30, 2009, Mr. Bekkedam, Mr. Hartline, and NOVA learned that Mr. Levin defaulted on his subscription obligation.  Id. ¶¶ 33-34, 48(c).  The Bonomos further allege that although Mr. Bekkedam and NOVA were aware of Mr. Bekkedam's previous statements regarding Mr. Levin's expected investment, neither NOVA nor Mr. Bekkedam updated the Bonomos prior to their purchase.  Id. ¶¶ 49-50.

The Bonomos allegations regarding Mr. Bekkedam's statements about Mr. Levin fail for much the same reasons as the statements regarding the DVFG and AFC acquisitions.  First of all, the June PPM makes no representations regarding Mr. Levin or his participation in the offering.  Secondly, the June PPM explicitly cautions that "[t]here is no minimum number of Shares that must be sold in order for the Company to make the offering effective.  You may be the only investor that invests in this offering."  June PPM at 2.

Even assuming that this cautionary language in the June PPM does not operate to immunize Mr. Bekkedam's oral statements from liability, as with the statements regarding the DVFG and AFC acquisitions, the Bonomos fail to plead with sufficient particularity when Mr. Bekkedam made these statements to Mr. Bonomo, and more importantly, when Mr. Bekkedam and NOVA learned that Mr. Levin would not be investing in the June Offering, thus triggering an alleged duty to update. Indeed, the Bonomos allege that Mr. Bekkedam made his statements in "the fall of 2009" and NOVA learned that Mr. Levin would not be investing in the stock offering "prior to Plaintiffs' investment and the closing of the June Offering." Compl. ¶¶ 23, 33, 48. Such allegations are insufficient to satisfy the PSLRA's pleading requirements.

## 2. Scienter

Even assuming that the Bonomos had sufficiently alleged that NOVA had a duty to update (and when such a duty arose), the Bonomos have failed to allege facts when taken collectively, give rise to a strong inference of scienter. Tellabs, 551 U.S. at 322-23. To adequately plead scienter, a plaintiff must allege facts giving rise to a "strong inference" of "either reckless or conscious behavior." Advanta, 180 F.3d at 534-35. A strong inference of scienter is one that is cogent and at least as compelling as any opposing inference of non-fraudulent intent. Id. at 323-24 ("The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences."); Avaya, 564 F.3d at 276 (noting that following Tellabs, "motive and opportunity" may no longer serve as an independent route to scienter). The pertinent question is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, 551 U.S. at 322-23.

23

"[A]s with all totality-of-the circumstances tests, our analysis will be case specific [and] will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter."  Avaya, 564 F.3d at 269 (citations omitted).

The totality of the facts alleged here fails to establish a strong inference of scienter on the part of NOVA and Mr. Bekkedam.  To establish scienter, the Bonomos make the following allegations: (1) NOVA needed to raise funds to increase Nova Bank's capital ratios for regulatory compliance and to finance the DVFG and AFC transactions, Compl. ¶ 19, (2) NOVA learned prior to the close of the June Offering that its financial condition had worsened, Mr. Levin would not be investing, and the DVFG and AFC transactions would not take place, Id. ¶ 48, and (3) 17 days after the June Offering closed, NOVA issued the November PPM disclosing these facts and others.  Id. ¶¶ 38-44.

As an initial matter, NOVA's need to raise funds is not indicative of a fraudulent motive.  "[M]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud."  Washington, 368 F.3d at 237.  The Bonomos have not particularized any personal benefit beyond a general corporate desire to make money.  "In every corporate transaction, the corporation and its officers have a desire to complete the transaction."  Id.  Therefore, NOVA's desire to make money, while relevant to the totality of the circumstances, fails to contribute meaningfully to a "strong inference" of scienter.

Likewise, NOVA and Mr. Bekkedam's alleged knowledge of the adverse developments to NOVA's business and failure to communicate them to the Bonomos, as pled, is equally insufficient to establish a strong inference of scienter. The Bonomos allege only that NOVA "failed to disclose" the adverse developments "prior to plaintiffs' investment and the closing of the June Offering." Compl. ¶ 48. However, because the Complaint is silent as to when NOVA and Mr. Bekkedam actually learned of each specific adverse development, it is just as likely that NOVA learned of these developments at a point in time that would have rendered disclosure improbable, impractical, or impossible. As noted above, counsel for the Bonomos represented at oral argument that the duty to update arose "at or immediately before" the Bonomos investment. Considering that the Complaint sheds no light on the length of time between when NOVA learned of this information and when the Bonomos made this investment, it is more likely than not, based on the facts alleged, that NOVA failed to update NOVA for completely innocuous reasons.

Finally, the Court cannot conclude based on the allegations of the Complaint that NOVA's release of the November PPM 17 days after the close of the June Offering establishes a strong inference of scienter. The Court acknowledges that the temporal proximity of the release of the November PPM to the close of the June Offering suggests that NOVA had knowledge of the adverse developments at or near the close of the June Offering. Indeed, a document of the length and complexity of a private offering memorandum is not the type that is generally drafted and published overnight. However, absent more particularized allegations, the Court cannot conclude that a corporation's disclosure of information to private investors learned 17 days earlier is suggestive of fraudulent intent, particularly considering that (1) it had no reason to

25

disclose this information once the June Offering closed other than to raise more capital in a new offering, and (2) the Bonomos have failed to plead with particularity when this purported duty to update arose or if such a duty even existed.

Upon consideration of all the allegations, the Court concludes that the Complaint fails to "state with particularity facts giving rise to a strong inference" that the defendants acted with scienter.

### B.       Common Law Fraud

NOVA next argues that the Bonomos have failed to plead common law fraud under the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  In Pennsylvania, common law fraud requires proof of (1) a misrepresentation, (2) material to the transaction, (3) made falsely, (4) with the intent of misleading another to rely on it, (5) justifiable reliance, and (6) an injury that was proximately caused by the reliance.  Santana Prods., Inc. v. Bobrick Washroom Equip., Inc., 401 F.3d 123, 136 (3d Cir. 2005); Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994).

NOVA argues that the Bonomos's common law fraud claims should be dismissed for many of the same reasons it asserts with respect to the securities fraud claim under Section 10(b) and Rule 10b-5.  The Court agrees.  Because the Court has already determined that the Bonomos have failed to allege that NOVA had a duty to update statements made in the June PPM, the Court finds that the Bonomos have also failed to plead a claim of common law fraud under Rule 9(b).

### C.    Unjust Enrichment

NOVA asserts that the Bonomos's claim for unjust enrichment should be dismissed because a contract existed between the parties.  Unjust enrichment actions sound in quasi-contract, <u>Sevast v. Kakouras</u>, 915 A.2d 1147, 1153 n.7 (Pa. 2007), and "[b]y its nature, the doctrine of quasi-contact, or unjust enrichment, is inapplicable where a written or express contract exists."  <u>Lackner v. Glosser</u>, 892 A.2d 21, 34 (Pa. Super. 2006).  Accordingly, NOVA argues, because the parties' relationship is allegedly based on the subscription agreement, the Court should dismiss the unjust enrichment claim.

"[T]hat a complaint alleges an unjust enrichment claim and also brings alternative claims for relief that might constitute adequate remedies at law is of no consequence under the pleading constraints of the Federal Rules of Civil Procedure.  Rule 8 allows plaintiffs to plead claims in the alternative despite inconsistencies 'in both legal and factual allegations.'"  <u>In re Processed Egg Prods. Antitrust Litig.</u>, No. 08-md-2002, 2012 WL 935669, at *35 (E.D. Pa. Mar. 20, 2012) (quoting <u>Indep. Enters. Inc. v. Pittsburgh Water and Sewer</u>, 103 F.3d 1165, 1175 (3d Cir. 1997); <u>see</u> Fed. R. Civ. P. 8 (d)(2), (3).  Although the existence of a contract governing the relationship of the parties may eventually bar the Bonomos from pursuing their unjust enrichment claim, there is no such bar at this stage of the proceedings.

However, the Third Circuit Court of Appeals has held that "where the plaintiff grounds [his] claims in allegations of fraud—and the claims thus 'sound in fraud'—the heightened pleading requirements of Rule 9(b) apply."  <u>In re Suprema Specialties, Inc. Sec. Litig.</u>, 438 F.3d 256, 270 (3d Cir. 2006); <u>see</u> <u>also</u> <u>Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.</u>, 394 F.3d 126, 161–62 (3d Cir. 2004).  There is no requirement that fraud or mistake be a necessary element of a

prima facie claim in order for Rule 9(b) to apply.  See Chubb, 394 F.3d at 161 (discussing this

law with respect to a section 11 Securities Act claim); see also Vess v. Ciba–Geigy Corp. USA,

317 F.3d 1097, 1103 (9th Cir. 2003) ("In cases where fraud is not a necessary element of a claim,

a plaintiff may choose nonetheless to allege in the complaint that the defendant has engaged in

fraudulent conduct.  In some cases, the plaintiff may allege a unified course of fraudulent conduct

and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said

to be 'grounded in fraud' or to 'sound in fraud,' and the pleading of that claim as a whole must

satisfy the particularity requirement of Rule 9(b).").

Here, the Bonomos's unjust enrichment claim is premised entirely on the conduct

underlying its inadequately pled securities fraud and common law fraud actions.  Because the

Bonomos's unjust enrichment claim is subject to the heightened pleading requirements of Rule

9(b), the Court concludes that they have failed to plead with sufficient particularity that NOVA

accepted and retained the Bonomos's investment "under such circumstances that it would be

inequitable for defendant to retain the benefit without payment of value."  Accordingly, the Court

concludes that the Bonomos have also failed to plead a claim of unjust enrichment under Rule

9(b).[12]

---

[12] Because the Court will dismiss the Bonomos's claims for failure to state claim upon which
relief can be granted, it will not address NOVA's argument that the Bonomos's failure to join
Mr. Bekkedam as a necessary and indispensable party requires the dismissal of their complaint.

V.      **CONCLUSION**

For the foregoing reasons, the Court will grant NOVA's motion to dismiss without prejudice to the Bonomos filing an amended complaint, provided they do so within the time period set forth in the accompanying Order.


BY THE COURT:


S/Gene E.K. Pratter
GENE E. K. PRATTER
United States District Judge