## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTHONY J. BONOMO, and<br>MARY ELLEN BONOMO,<br><br>                      Plaintiffs,<br><br>        v.<br><br>NOVA FINANCIAL HOLDINGS, INC.<br><br>                and<br><br>NOVA BANK,<br><br>                  Defendants. | : : : : : : : : : : : : : : : | CIVIL ACTION<br><br>NO. 11-4762 |

### AMENDED COMPLAINT

Plaintiffs Anthony J. and Mary Ellen Bonomo ("Plaintiffs"), by way of their Amended Complaint against defendants Nova Financial Holdings, Inc. ("Nova Holdings") and its wholly-owned subsidiary Nova Bank ("Nova Bank," and together with Nova Holdings, jointly, "Nova"), hereby allege the following based upon personal knowledge as to them and their own acts, and as to all other matters, the investigation conducted by and through their attorneys, which included, among other things, the review of non-confidential documents filed and/or produced in discovery in other lawsuits against Nova, its agent Barry Bekkedam ("Bekkedam"), and/or non-parties referenced herein.[1]  Many of the facts supporting the

---

[1] These documents include, *inter alia*, the following exhibits appended hereto and incorporated herein by reference:  Exhibit A (Complaint filed in *Musser v. Nova Bank*, No. 2011-16474 (Montgomery County CCP) ("*Musser* Complaint")); Exhibit B (Excerpts from deposition transcript of Thomas J. Patterson, appended to *Musser* Complaint); Exhibit C (Excerpts from deposition transcript of Edward DiMarcantonio, appended to *Musser* Complaint); Exhibit D (Excerpts from deposition transcript of Brian Hartline, appended to *Musser* Complaint); Exhibit E (Sept. 24, 2009 Letter from Barry Bekkedam to Investors in Nova/DVFG transaction, appended to *Musser* Complaint); Exhibit F (Oct. 26, 2009 email between Barry Bekkedam and George Levin, produced in *Razorback*

allegations of this Amended Complaint are known only to Nova, Bekkedam, and/or certain non-parties, or are exclusively within their custody and/or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Amended Complaint after a reasonable opportunity for discovery.

## SUMMARY

1.      At all times relevant to this action, Bekkedam exercised control over the management of Nova and acted as its agent. Bekkedam, a licensed investment advisor, also owned and operated Ballamor Capital Management ("Ballamor"), which offered financial advisory services to high net worth individuals. Bekkedam raised substantially all of Nova Holdings' capital from Ballamor's investment advisory clients, and through his control over Ballamor's clients, Bekkedam controlled the majority of Nova Holdings' voting shares.

2.      Beginning in or about 2006 until early 2010, Bekkedam and Ballomor were the primary investment advisors for Plaintiff Anthony J. Bonomo ("Bonomo") and managed or directed investment of substantially all assets of Bonomo's company, AJB Ventures Inc. ("AJB") and its affiliates.

3.      From at least July 2008 to October 2009, and unbeknownst to Plaintiffs, George Levin ("Levin") and Frank Preve ("Preve") participated in a Ponzi scheme perpetrated by Scott Rothstein ("Rothstein") through his law firm, Rothstein Rosenfeldt Adler, P.A.

---

*Funding, LLC v. Rothstein*, No. 09-062943 (Broward County, FL Circuit Court) ("*Razorback*")); Exhibit G (Oct. 29, 2009 email from Barry Bekkedam to George Levin, produced in *Razorback*); Exhibit H (DVFG July 25, 2009 Notice of Termination of Merger with Nova, produced in *Weiss v. Nova Financial Holdings Inc.*, 2:11-cv-05336 (E.D.Pa.) ("*Weiss*")); Exhibit I (June 30, 2009 Nova Private Placement Memorandum); Exhibit J (Nov. 16, 2009 Nova Private Placement Memorandum); Exhibit K (excerpts from Nova audited consolidated financial statements for 2009 and 2010; Exhibit L (Complaint filed in *Securities and Exchange Commission v. Levin*, No. 2012cv21917 (S.D.Fl.) ("SEC Complaint")); Exhibit M (Complaint filed in *In re Chapter 11 Rothstein Rosenfeldt Adler, P.A.*, No. 09-34791 (Bankr. S.D.Fl.) ("RAA Complaint")).

("RRA"), by selling to investors promissory notes issued by Levin's company Banyon 1030-32, LLC, and using the funds to purchase fake legal settlements from Rothstein.

4.      In early 2009, unbeknownst to Plaintiffs, Bekkedam assisted Levin and Preve in establishing a "feeder" fund, Banyon Income Fund II, L.P. ("Banyon"), for the purpose of soliciting Bekkedam's clients to invest in Rothstein's Ponzi scheme.  As a *quid pro quo* for Bekkedam's raising $40 million for Levin's Banyon fund, Bekkedam arranged for Levin to help "fix" Nova's severe undercapitalization problems and avoid a takeover by bank regulators by (a) orchestrating a $5 million loan from Nova Bank to Levin and transferring the $5 million loan proceeds (through Levin's account at Gibraltar Bank in Miami) to Nova Holdings for payment of stock purportedly "purchased" by Levin; and (b) obtaining Levin's commitment to subscribe for an additional $13 million in Nova Holdings stock through a June 30, 2009 private offering ("June Offering").  On or before June 30, 2009, the day on which the entire $5 million loan to investment transaction took place, Nova – including Bekkedam; Nova's president and chief executive officer, Brian Hartline; Nova's board chairman, Edward DiMarcantonio; and Nova Bank's then senior vice president of commercial lending and executive officer, Thomas Patterson  – knew that this purported "investment" by Levin would not be considered "capital" by the bank regulators if the regulators discovered that it was funded by Nova Bank.  (*See* Exh. A, Musser Compl. ¶¶ 106-124; Exh. B, Patterson Dep. Tr. at 23-26, 39-40; Exh. C, DiMarcantonio Dep. Tr. at 40-41, 116-119, 126-127; Exh. D, Hartline Dep. Tr. at 52, 55-57, 70-71, 72-74.)  Nonetheless, Bekkedam affirmatively misrepresented to existing Nova investors that "the bank has and is in process of fulfilling all of its capital requirements ensuring a well capitalized status and providing it with the financial strength to execute on our unified vision.

Ballamor's clients and relationships infused $5 million into the bank in June."  (*See* Exh. E., Sept. 24, 2009 letter from B. Bekkedam to Investors in Nova/DVFG transaction.)

5.       Furthermore, as averred below, by no later than October 26, 2009, Bekkedam knew or was reckless in not knowing that Levin would not be purchasing Nova Holdings stock in the June Offering, which was scheduled to close on October 30, 2009.

6.       As set forth in Nova Holdings' Confidential Private Placement Memorandum for the June Offering ("June PPM"), the stated purpose of the offering was, among other things, to increase Nova's capital ratios for regulatory compliance and to finance acquisitions of Delaware Valley Financial Group ("DVFG") and AFC First Financial Corporation ("AFC") (jointly, the "Proposed Acquisitions").  (*See* Exh. I, June PPM at 2, 25, 31-32.)

7.       Less than one month later, however, on July 25, 2009, DVFG sent a formal notice to Nova, terminating the Nova-DVFG merger agreement.  (*See* Exh. H, July 25, 2009 DVFG termination notice.)  Not only did Nova fail to update the June PPM and advise prospective Nova investors that the Proposed Acquisition of DVFG would not take place, but as late as September 24, 2009, Bekkedam affirmatively misrepresented to existing Nova investors that "progress [was] being made toward the anticipated closing of the Nova Bank and DVFG merger."  (*See* Exh. E., Sept. 24, 2009 letter from B. Bekkedam to Investors in Nova/DVFG transaction.)

8.       The June PPM also stated that, as of March 31, 2009, Nova had total assets in the amount of approximately $647.3 million, net income in the amount of $60 thousand, and $33 million in stockholders' equity.  (*See* Exh. I, June PPM at 40, 42, 43.)  By no later than October 15, 2009, however, Nova had closed its books and prepared its consolidated financial

statements for the quarter ending September 30, 2009, and knew that its financial condition had deteriorated significantly since it commenced the June Offering.  Nova knew, for example, that Nova's financial statements for the quarter ending September 30, 2009 reported a $7.3 million loss instead of the $60 thousand in net income that was reported in the June PPM, and that the $7.3 million loss primarily arose out of the bank regulators requiring  Nova to write down $4.4 million in assets and increase the provision for loan losses by $3.8 million.  Moreover – despite Levin's purported $5 million in Nova stock on June 30, 2009 – its stockholders' equity had dropped from $33 million to $29.7 million.   (*See* Exh. J, November PPM at 39-46.)  Between October 15, 2009 and the close of the June Offering on October 30, 2009, Nova failed to update prospective investors on its significant recent losses and adverse changes in its financial condition; by doing so, Nova intentionally led prospective investors to believe that its financial condition was significantly stronger than it actually was.

9.     On or before October 26, 2009, Rothstein's Ponzi scheme collapsed, and he was unable to make any payments to investors.  On or about October 27, 2009, Rothstein fled the United States to Morocco.

10.     As demonstrated by his October 26, 2009 email communications with Levin, Bekkedam knew by the morning of October 26, 2009 that Rothstein's Ponzi scheme was collapsing; that, without the payouts from Rothstein, Banyon would be unable to make its payment commitments to Bekkedam's investors; and that Levin would not be purchasing Nova stock in the June Offering.  (*See* Exh. F, Oct. 26, 2009 email between B. Bekkedam and G. Levin.)

11.     Desperate to find other sources of funds for both Banyon and Nova before news of Rothstein's Ponzi scheme broke, Bekkedam called Bonomo on or about October 26,

2009, after his email communications with Levin, referenced above, and told Bonomo that he wanted him to invest $2.5 million in Nova (via the June Offering) and $2 million in Banyon. Bonomo told Bekkedam that he did not have the cash to make any such investments.  To aggressively persuade Bonomo to make the investment in Nova Holdings through a loan from Nova Bank (collectively, "the Transaction"), Bekkedam made the following misrepresentations to Bonomo on or about October 26, 2009:

       a.   To induce Bonomo to go forward with the Transaction, Bekkedam told Bonomo that Nova Bank would loan him $4.5 million (the "Loan") to cover both investments, and that, if he used $2.5 million of the loan proceeds to purchase Nova stock, his investment would increase Nova's capital and help alleviate its capitalization problems.  This statement was materially false and misleading at the time it was made because Bekkedam knew then that bank regulators would not consider Nova stock purchased with a Nova loan as capital.  Bekkedam knew that, if he told Bonomo the truth – that Bonomo's investment in Nova with proceeds from a Nova loan would not be considered capital – Bonomo would not go forward with the Transaction.

       b.   To induce Bonomo to go forward with the Transaction, Bekkedam told Bonomo that Levin had already purchased $5 million in Nova stock and that Levin's investment had improved Nova's capitalization status.  This statement was materially false and misleading at the time it was made because Bekkedam knew then that, if the bank regulators knew Levin's stock purchase was made from Nova loan proceeds, they would not consider the investment to be capital.  Bekkedam knew that, if he told Bonomo the truth – that Levin's investment in Nova with proceeds from a Nova loan was not considered capital – Bonomo would not go forward with the Transaction.

c.   To induce Bonomo to go forward with the Transaction, Bekkedam told Bonomo that, if he purchased $2.5 million in Nova stock through the June Offering that Nova would be able to go forward with its Proposed Acquisitions of DVFG and AFC.  This statement was materially false and misleading at the time it was made because Bekkedam knew then that DVFG had terminated the Nova-DVFG merger agreement in July 2009.   Bekkedam knew that, if he told Bonomo the truth – that DVFG had already terminated the merger agreement – Bonomo would not go forward with the transaction.  This statement was also materially false and misleading for the additional reason that Bekkedam knew then that Levin would not be following through with his commitment to purchase $13 million in Nova stock through the June Offering and, therefore, there would be insufficient proceeds from the offering to go forward with the Proposed Acquisition of AFC.  Bekkedam knew that, if he told Bonomo the truth – that Levin would not be following through with his $13 million commitment – Bonomo would not go forward with the Transaction.

d.   To induce Bonomo to go forward with the Transaction, Bekkedam told Bonomo that Levin was committed to purchasing $13 million in Nova stock through the June Offering and that Levin's investment would enable Nova to alleviate its undercapitalization problems and satisfy its regulatory requirements.  This statement was materially false and misleading at the time it was made because Bekkedam knew then that Rothstein's Ponzi scheme was collapsing and that Levin would be unable to make any further investment in Nova. Bekkedam did not tell Bonomo that Banyon was a feeder fund for Rothstein's Ponzi scheme that had collapsed or was on the verge of collapsing, that any further investment in Banyon would be worthless, and that Levin would not be purchasing any Nova stock in the June Offering.

Bekkedam knew that, if Bonomo knew this information, he would not go forward with the Transaction.

          12.     On or about October 26 or 27, 2009, Bekkedam provided Bonomo with a copy of the June PPM.   Bekkedam and Nova had a duty to update the following representations made in the June PPM  based on information they knew as of October 26, 2009, but they failed to do so.

          a.   The June PPM stated that the purpose of the June offering was, among other things, to increase Nova's capital ratios for regulatory compliance and to finance the Proposed Acquisitions of DVFG and AFC.  (*See* Exh. I, June PPM at 2, 25, 31-32.)  By October 26, 2009, Bekkedam and Nova knew that DVFG had already terminated the Nova-DVFG merger agreement; that, without a $13 million investment by Levin, Nova would not be able to increase Nova's capital ratios for regulatory compliance or to finance the Proposed Acquisition of AFC; and that any purchases of Nova stock with Nova loan proceeds would not constitute capital and, therefore, could not alleviate Nova's capitalization problems.  Bekkedam and Nova did not update the June PPM with this information because they knew that, if Bonomo knew this information, he would not go forward with the Transaction.

          b.   The June PPM also stated that, as of March 31, 2009, Nova had total assets in the amount of approximately $647.3 million, net income in the amount of $60 thousand, and $33 million in shareholders' equity.  (*See* Exh. I, June PPM at 40, 42, 43.)  Because Nova had closed its books and prepared its consolidated financial statements for the quarter ending September 30, 2009 before October 26, 2009, Bekkedam and Nova knew that Nova's financial statements for the quarter ending September 30, 2009 reported a $7.3 million loss instead of the $60 thousand in net income that was reported in the June PPM, and that the $7.3 million loss

primarily arose out of the bank regulators requiring Nova to write down $4.4 million in assets and increase the provision for loan losses by $3.8 million.  Moreover – despite Levin's purported $5 million in Nova stock on June 30, 2009 – its stockholders' equity had dropped from $33 million to $29.7 million.   (*See* Exh. J, November PPM at 39-46.)  Bekkedam and Nova did not update the June PPM with this information because they knew that, if Bonomo knew this information, he would not go forward with the Transaction.

13.     On Thursday, October 29, 2009, Bekkedam's told Levin in an email message that he was "rattle[d]" by the collapsing Rothstein Ponzi scheme.  (*See* Exh. G, Oct. 29, 2009 email from B. Bekkedam to G. Levin.)

14.     At no time between October 26, 2009 and October 30, 2009, did Bekkedam or Nova provide Bonomo with the information delineated in paragraphs 9 through 13 above.

15.     On Friday, October 30, 2009, Plaintiffs signed the June Offering subscription agreement, and the June Offering closed.

16.     Beginning on Saturday, October 31, 2009, the day after the June Offering closed, the media widely reported the news of Rothstein's Ponzi scheme and its collapse.  On Monday, November 2, 2009, Rothstein's law firm, RRA, filed a Complaint for Dissolution and for Emergency Appointment of a Receiver.

17.     It was not until ***after*** the close of the June Offering and Bonomo's investment in the June Offering, that Bekkedam told Bonomo that Plaintiffs' investment in Banyon was worthless, that Nova had suffered significant losses, and that Nova needed to raise significant new equity.

18.     At all material times, Nova knew or should have known that Bonomo was placing his trust and confidence in Nova and in Bekkedam, as Nova's agent, and that, with respect to Bonomo, Nova had a duty to act in good faith, to deal fairly and openly toward Bonomo, and to refrain from using its superior position to Bonomo's detriment.

19.     As Bonomo's fiduciary, Nova owed him the utmost duty of loyalty and good faith and was required to act solely for his benefit.  Instead, Bekkedam and Nova intended that Bekkedam's conduct in inducing Bonomo to borrow $4.5 million from Nova Bank and invest $2.5 million of the loan proceeds in Nova Holdings stock would benefit, and did substantially benefit, Nova at Bonomo's expense.  Nova ratified Bekkedam's conduct by knowingly accepting the benefits thereof.

20.     Through the conduct of its Bekkedam, its agent, Nova committed (a) violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder (Count One); (b) common law fraud (Count Two); (c) breach of fiduciary duty (Count Three); and unjust enrichment (Count Four).

## THE PARTIES

21.     Plaintiff Anthony J. Bonomo is an individual residing at 10 Walter Lane, Manhasset, New York 11030.

22.     Plaintiff Mary Ellen Bonomo is an individual residing at 10 Walter Lane, Manhasset, New York 11030 and the wife of Anthony J. Bonomo (where no distinction is necessary, Bonomo and Mary Ellen Bonomo are collectively referenced to as "Plaintiffs").

23.     Defendant Nova Holdings is a Pennsylvania corporation and a registered bank holding company having it principal place of business at 1235 Westlakes Drive, Suite 420, Berwyn, PA 19312.

24.     Defendant Nova Bank is a Pennsylvania state chartered bank with its

principal place of business at 1235 Westlakes Drive, Suite 420, Berwyn, PA 19312.  At all

material times, Nova Bank was a wholly-owned subsidiary of and controlled by Nova Holdings.

25.     Defendants Nova Holdings and Nova Bank are alter egos of one another.

### JURISDICTION AND VENUE

26.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331

because some of the claims herein arise under the laws of the United States.  This Court also has

jurisdiction pursuant to 28 U.S.C. §1332 because the matter in controversy exceeds the sum of

$75,000.00, exclusive of interest and costs, and the claims are between citizens of different

states, there being complete diversity of citizenship.  This Court also has supplemental

jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a) because the

state law claims are so related to the claims under the laws of the United States that they form

part of the same case or controversy under Article III of the United States Constitution.

27.     This Court has personal jurisdiction over Nova Holdings because it is a

Pennsylvania corporation with its principal place of business in Pennsylvania, and the Court has

personal jurisdiction over Nova Bank because it is a Pennsylvania state chartered bank with its

principal place of business in Pennsylvania.

28.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)

because Nova Holdings and Nova Bank are subject to personal jurisdiction in this district and a

substantial part of the events or omissions giving rise to the claims herein occurred in this

district.

## FACTS

### The Formation Of Nova

29.     In 2002, Bekkedam organized and founded Nova Holdings to acquire USABancShares.com, Inc. in a merger that closed on October 31, 2002.

30.     Nova Holdings operates as a bank holding company with its primary activity being derived from the operation of its two wholly owned subsidiaries, Nova Bank and Nova Capital Trust I, a Delaware business trust.

31.     From approximately 1998 to 2010, Bekkedam owned and operated Ballamor Capital Management ("Ballamor").  Ballamor offered financial advisory services including asset management and financial planning.  Its primary clients were high net worth individuals.

32.     Bekkedam was the initial Chairman of both Nova Holdings and Nova Bank and raised virtually all of Nova Holdings' capital from investment advisory clients of Ballamor.  At all relevant times, Brian Hartline ("Hartline") was the President and Chief Executive Officer of both Nova Holdings and Nova Bank.

33.     Bekkedam resigned from the Board of Directors of both Nova Holdings and Nova Bank in December 2007 because of regulatory issues affecting his ability to control both Ballamor, a registered investment advisor, and Nova Holdings, a regulated bank holding company.

34.     Notwithstanding his resignation from their boards, Bekkedam continued to exercise control over the management of Nova Holdings and Nova Bank.  Indeed, throughout the relevant time period, Bekkedam steered Ballamor's investor advisory clients to purchase stock in in Nova Holdings with the result that substantially all of Nova Holdings' stock was owned by

Ballamor clients.  Through his control over Ballamor's clients, Bekkedam controlled the majority of Nova Holdings' voting shares.

35.     In addition, Bekkedam arranged for Edward DiMarcantonio, his long-time friend and business partner in other ventures, to serve as the Chairman of Nova Holdings and as a director of Nova Bank.  As the former senior vice president and executive officer of Nova Bank has explained, DiMarcantonio served as Bekkedam's "eyes and ears," and "[E]verything that went on at the bank, Barry [Bekkedam] was aware of, whether it was himself or through Ed [DiMarcantonio]."  (*See* Exh. A, *Musser* Compl. ¶ 21; Exh. B,. Patterson Dep. Tr. at 12, 13.)

36.     Despite his resignation from the boards of Nova Holdings and Nova Bank, Bekkedam continued to represent that he controlled both entities.

### Bekkedam's Relationship With Bonomo And AJB

37.     Bonomo is the controlling stockholder and CEO of AJB Ventures Inc. ("AJB").

38.     In 2006, Ballamor formed two partnerships comprised of Ballamor investment advisory clients to loan AJB money to finance AJB's acquisition of an insurance management company.

39.     Prior to the acquisition, Bonomo and AJB became investment advisory clients of Ballamor and Bekkedam became a director of AJB.

40.     Until early 2010, Ballamor and Bekkedam were the primary investment advisors for Bonomo and managed or directed investment of all assets of AJB and its affiliates.

### Bekkedam's Participation In Scott Rothstein's Ponzi Scheme

41.     From at least July 2008 to October 2009, and unbeknownst to Plaintiffs, Levin and Preve participated in a Ponzi scheme perpetrated by Rothstein through his law firm,

RRA, by selling to investors promissory notes issued by Levin's company Banyon 1030-32, LLC, and using the funds to purchase fake legal settlements from Rothstein. Levin and Preve knew or were reckless in not knowing that the purported settlements and settlement proceeds were not real and that the supposed parties to the settlements did not exist.

42.     In early 2009, unbeknownst to Plaintiffs, Bekkedam assisted Levin and Preve in establishing a "feeder" fund, Banyon, for the purpose of soliciting Bekkedam's clients to invest in Rothstein's Ponzi scheme. As a *quid pro quo* for Bekkedam's raising $40 million for Levin's Banyon fund, Bekkedam arranged for Levin to help "fix" Nova's severe undercapitalization problems and avoid a takeover by bank regulators by (a) orchestrating a $5 million loan from Nova Bank to Levin and transferring the $5 million loan proceeds (through Levin's account at Gibraltar Bank in Miami) to Nova Holdings for payment of stock purportedly "purchased" by Levin; and (b) obtaining Levin's commitment to subscribe for an additional $13 million in Nova Holdings stock through the June Offering described below. On or before June 30, 2009, the day on which the entire $5 million loan to investment transaction took place, Nova – including Bekkedam, Hartline, DiMarcantonio, and Patterson – knew that this purported "investment" by Levin would not be considered "capital" by the bank regulators if the regulators discovered that it was funded by Nova Bank. (*See* Exh. A, Musser Compl. ¶¶ 106-124; Exh. B, Patterson Dep. Tr. at 23-26, 39-40; Exh. C, DiMarcantonio Dep. Tr. at 40-41, 116-110, 126-127; Exh. D, Hartline Dep. Tr. at 55-56, 70-71, 72-73.) Nonetheless, Bekkedam affirmatively misrepresented to existing Nova investors that "the bank has and is in process of fulfilling all of its capital requirements ensuring a well capitalized status and providing it with the financial strength to execute on our unified vision. Ballamor's clients and relationships infused $5 million

into the bank in June."  (*See* Exh. E., Sept. 24, 2009 letter from B. Bekkedam to Investors in Nova/DVFG transaction.)

          43.     On May 22, 2012, the United States Securities and Exchange Commission ("SEC"), based upon its investigation, filed a complaint ("SEC Complaint") against Levin and Preve for violations of the federal securities laws.  The SEC's Complaint describes in detail, *inter alia*, the relationship among Levin, Preve, Rothstein, and Bekkedam as follows:

          a.   "From at least July 2008 to October 2009, George Levin and Frank Preve defrauded investors in raising funds to purchase purported legal settlements from now-convicted Ponzi schemer Scott Rothstein.  Rothstein perpetrated a massive Ponzi scheme through the sale of fake discounted settlements utilizing his law firm [RRA].  Levin and Preve sold promissory notes and created a feeder fund to funnel investor capital to Rothstein, ultimately becoming his largest source of capital.  With their fate tied to Rothstein, Levin and Preve's settlement purchasing business collapsed along with the Ponzi scheme in October 2009.  (*See* Exh. L, SEC Compl. ¶ 1.)

          b.   "Between December 2007 until Rothstein's Ponzi scheme collapsed in October 2009," Levin and Preve, by issuing promissory notes through a limited liability company, Banyon 1030-32, "raised more than $57 million from 90 investors to purchase Rothstein settlements."  (*Id*. ¶ 30.)

          c.   "Levin and Preve also obtained additional financing to purchase Rothstein's settlements.  Between April and November 2008, Levin, through separately created entities, entered into credit and security agreements with three New York based hedge funds."  (*Id*. ¶ 33.)

d.   "In December 2008, Levin and Preve began purchasing fewer settlements from Rothstein because the hedge funds were not approving full use of the lines of credit.  As the three hedge funds decreased funding, Rothstein began to miss scheduled settlement payments to the associated Levin entities in early 2009.  Rothstein complained to Levin and Preve about their decreasing settlement funding, claiming he had convinced his clients to settle with the promise of immediate funding and now he could not satisfy the promise of immediate payments to his clients. . . .  The only way he could resume making payments, Rothstein said, was for Levin and Preve to provide him with approximately $100 million to fund the commitments he supposedly had already made to plaintiffs."  (*Id*. ¶¶ 34, 36.)

e.   "By mid April 2009, Rothstein had ceased payments on a majority of the settlements the associated Levin entities had purchased, and the hedge funds had stopped advancing any money under the lines of credit."  (*Id*. ¶ 37.)

f.   "With the RRA trust accounts locked up, Levin's investment strategy had ground to a halt.  Levin and Preve believed the only way to resume the investment strategy was to raise the additional $100 million Rothstein needed to meet his supposed existing commitments to his clients."  (*Id*. ¶ 38.)

g.   "In early 2009, in an effort to replace the then decreasing funding from the hedge funds, Levin and Preve began the process of establishing an investment fund to raise money to invest in Rothstein's settlements.  Levin and Preve, with the help of ***a Philadelphia investment adviser***, established Banyon . . . with the idea that ***the adviser*** would solicit his clients and others to invest in the fund.  Between May and October 2009, they together raised approximately $100 million for Banyon  . . . from approximately 83 investors."  (*Id*. ¶ 39 (emphasis added).)

-16-

     h.   Bekkedam is the "Philadelphia investment adviser" referenced in paragraph 38 of the SEC Complaint, above.  (*See* Exh. A, *Musser* Compl. ¶ 97.)

      i.   "By the end of the third quarter of 2009, Banyon . . . had funded approximately $140 million in settlement purchases, including reinvested funds, but lacked documentation for approximately $40 million of those purchases. . . .  In addition, by at least late September 2009, Levin and Preve both knew the independent verifier had not verified settlements purchased since July 2009.  They also knew the verifier could not verify settlements that were missing documentation. . . .  [Furthermore,] Levin and Preve knew and failed to disclose [to investors, *inter alia*, that] Rothstein had already ceased  making payments on previous settlements."  (Exh. L, SEC Compl. ¶¶ 44-46.)

      j.   "The additional investments from Banyon . . . provided Rothstein with only a temporary reprieve on his collapsing Ponzi scheme.  The $100 million Rothstein previously claimed he needed to fulfill his prior commitments to plaintiffs turned into an elusive, moving target as he continued to demand more funding from Levin and Preve.  By the end of October 2009, Rothstein's Ponzi scheme collapsed when he was no longer able to make any payments.  Absent the payouts from the RRA trust accounts, Banyon . . . was unable to meet its commitments to its investors and ceased to operate."  (*Id.* ¶ 48.)

     44.   As averred by Herbert Stettin, Chapter 11 Trustee of the RRA estate, in his April 25, 2012 adversary complaint ("RRA Complaint"), Bekkedam and Ballamor "aided Rothstein in the fraudulent scheme by successfully soliciting their clients to invest in the [settlements] through [Banyon]."  (*See* Exh. M, RRA Compl. ¶ 34.)

45.     Paragraph 35 of the RRA Complaint quotes the following testimony by Rothstein, which describes Bekkedam's "***vital role*** in assisting Rothstein with the Ponzi Scheme" (emphasis added):

a.   "According to Rothstein, he could 'count on Barry [Bekkedam] to do the right thing by us, meaning bring as many investors to the table with as little scrutiny as possible [b]ecause . . . Bekkedam] needed to borrow money from Mr. Levin to pay his personal bills . . . [a]nd he was also looking for a large infusion of capital into a bank of which he was the chairman . . . [a]nd there was a quid pro quo going on.'" (*Id*. ¶ 35 (citation omitted)).

b.   Rothstein further testified that "they had Bekkedam 'in their pocket and that he needed them for financial activity for his bank and for him personally and so he was going to do the right thing by the Ponzi scheme – without using the words Ponzi scheme.'" (*Id*. (citation omitted).)

c.   Rothstein "also confirmed the astonishing lack of [Bekkedam's] [d]ue [d]iligence, testifying that Bekkedam 'was always trying to make himself look like the white knight and everybody else to look like evil incarnate. That was the way he sold his products . . . the way he pitched himself.  It's all part and parcel of all the various lies that he was telling during the course of this whole scam to try to get money out of [Levin], both for his bank and for his own personal pockets,' further stating that '[y]ou need to under[stand] what was going on with him and his fake lawyer due diligence guy . . . both of whom allowed $25 million in paper in their clients' money to be paid into this Ponzi scheme without a shred of paper or even a tiny little bit of an audit.'" (*Id*. (citation omitted).)

## The June 2009 Offering

46.     At sometime prior to June 2009, Nova lost its "well capitalized" status for regulatory purposes and federal bank regulators imposed requirements that it raise more capital in order to be in compliance with applicable bank regulations.

47.     In or about June 2009, Nova commenced an offering for 2.7 million shares of its common stock at a price of $11.00 (the "June Offering") per share pursuant to a Confidential Private Placement Memorandum dated June 30, 2009 (the "June PPM").  The original September 30, 2009 closing date of the June Offering was extended to October 30, 2009.

48.     As set forth in the June PPM, the stated purpose of the offering was, among other things, to increase Nova's capital ratios for regulatory compliance and to finance the Proposed Acquisitions of DVFG and AFC.  (*See* Exh. I, June PPM at 2, 25, 31-32.)

49.     Less than one month later, however, on July 25, 2009, DVFG sent a formal notice to Nova, terminating the Nova-DVFG merger agreement.  (*See* Exh. H, July 25, 2009 DVFG termination notice.)  Not only did Nova fail to update the June PPM and advise prospective Nova investors that the Proposed Acquisition of DVFG would not take place, but as late as September 24, 2009, Bekkedam affirmatively misrepresented to existing Nova investors that "progress [was] being made toward the anticipated closing of the Nova Bank and DVFG merger."  (*See* Exh. E., Sept. 24, 2009 letter from B. Bekkedam to Investors in Nova/DVFG transaction.)

50.     The June PPM also stated that, as of March 31, 2009, Nova had total assets in the amount of approximately $647.3 million, net income in the amount of $60 thousand, and $32.9 million in shareholders' equity.  (*See* Exh. I, June PPM at 40, 42, 43.)  By no later than October 15, 2009, however, Nova had closed its books and prepared its consolidated financial statements for the quarter ending September 30, 2009, and knew that its financial condition had

-19-

deteriorated significantly since it commenced the June Offering.  Nova knew, for example, that Nova's financial statements for the quarter ending September 30, 2009 reported a $7.3 million loss instead of the $60 thousand in net income that was reported in the June PPM, and that the $7.3 million loss primarily arose out of the bank regulators requiring  Nova to write down $4.4 million in assets and increase the provision for loan losses of $3.8 million.  Moreover – despite Levin's purported $5 million in Nova stock on June 30, 2009 – its stockholders' equity had dropped from $33 million to $29.7 million.   (*See* Exh. J, November PPM at 39-46.)  Between October 15, 2009 and the close of the June Offering on October 30, 2009, Nova failed to update prospective investors on its significant recent losses and adverse changes in its financial condition; by doing so, Nova intentionally led prospective investors to believe that its financial condition was significantly stronger than it actually was.

51.     As of June 30, 2009, Nova anticipated that $13 million of the shares offered by the June PPM would be purchased by Levin.  Indeed, Bekkedam represented in his September 24, 2009 letter to existing Nova investors that "Ballamor's clients and relationships infused $5 million into the bank in June and have signed term sheets for an additional $13 million."  (*See* Exh. E, Sept. 24, 2009 Letter from B. Bekkedam to Investors in Nova/DVFG transaction.)  At no time prior to the October 30, 2009 closing of the June Offering, however, did either Bekkedam or Nova disclose to Nova's existing or prospective investors that the $5 million investment by Levin would not be considered capital by the bank regulators or that, at least as of October 26, 2009, Levin had no intention or ability of making any further investment in Nova.

### Bekkedam's Knowledge Of The Collapse Of Rothstein's Ponzi Scheme And Nova's Deteriorating Financial Condition

52.     On or before October 26, 2009, Rothstein's Ponzi collapsed, and he was unable to make any payments to investors.  On October 27, 2009, Rothstein fled the country to

Morocco.  *See, e.g.,* Norman, Bob, *Inside the Rothstein Swindle, Part III*, New Times Broward-Palm Beach, Nov. 18, 2009 (reporting that Rothstein left the country on October 27), http://blogs.browardpalmbeach.com/pulp/2009/11/td_bank_scott_rothstein.php#more; *see also* RRA's November 2, 2009 Complaint for Dissolution and for Emergency Appointment of a Receiver (reporting that "[f]irm lawyers learned *in the past few days* about irregularities surrounding a settlement funding business operated by Rothstein" and explaining that it was "*several days ago*" when firm lawyers "discovered some of the circumstances concerning Defendant Rothstein's actions and the alleged improprieties") (emphasis added), http://online.wsj.com/public/resources/documents/110209Rothsteinmotion.pdf.

53.     As demonstrated by his October 26, 2009 email communications with Levin, Bekkedam knew by the morning of October 26, 2009 that Rothstein's Ponzi scheme was collapsing; that, without the payouts from Rothstein, Banyon would be unable to make its payment commitments to its Bekkedam's investors; and that Levin would not be purchasing Nova stock in the June Offering.  (*See* Exh. F, Oct. 26, 2009 email between B. Bekkedam and G. Levin.)

54.     Nova and Bekkedam knew that, without Levin's $13 million investment, the June Offering would not raise sufficient funds to eliminate Nova's undercapitalization problems and satisfy its regulatory requirements to raise additional capital or enable it to acquire the Proposed Acquisition of AFC.

55.     In addition, as averred in paragraph 50 above, by October 15, 2009, Nova had closed its books and prepared its consolidated financial statements for the quarter ending September 30, 2009.  Therefore, by the time of the collapse of Rothstein's Ponzi scheme on October 26, 2009, Nova and Bekkedam were well aware that Nova's financial condition had

deteriorated significantly since Nova commenced the June Offering, and they had a duty to update the June PPM as delineated in paragraphs 12, 60, and 81 herein.

56. Because Nova and Bekkedam knew that no prospective investor would purchase shares in the June Offering if they disclosed the new information delineated in paragraphs 11-12, 59-60, and 80-81 herein, they concealed it to the detriment of the investors.

57. On Thursday, October 29, 2009, Bekkedam's told Levin in an email message that he was "rattle[d]" by the collapsing Rothstein Ponzi scheme. (*See* Exh. G, Oct. 29, 2009 email from B. Bekkedam to G. Levin.) Nonetheless, at no time between October 26, 2009 and October 30, 2009, did Bekkedam or Nova provide prospective Nova investors with the information delineated in paragraphs 9, 10, 11(d), 13, 52-54, 59(d), 61, and 80(d) herein.

58. On Friday, October 30, 2009, the June Offering closed.

## Plaintiffs' Investment In Nova

59. Desperate to find other sources of funds for both Banyon and Nova before news of Rothstein's Ponzi scheme broke, Bekkedam called Bonomo on or about October 26, 2009, after his email communications with Levin, referenced above, and told Bonomo that he wanted him to invest a total $2.5 million in Nova (via the June Offering) and $2 million in Banyon. Bonomo told Bekkedam that he did not have the cash to make any such investments. To aggressively persuade Bonomo to make the investment through a loan from Nova Bank Bekkedam made the following misrepresentations to Bonomo on or about October 26, 2009:

a. To induce Bonomo to go forward with the Transaction, Bekkedam told Bonomo that Nova Bank would loan him $4.5 million to cover both investments, and that, if he used $2.5 million of the loan proceeds to purchase Nova stock, his investment would increase Nova's capital and help alleviate its capitalization problems. This statement was materially false and misleading at the time it was made because Bekkedam knew then that bank regulators would

not consider Nova stock purchased with a Nova loan as capital.  Bekkedam knew that, if he told Bonomo the truth – that Bonomo's investment in Nova with proceeds from a Nova loan would not be considered capital – Bonomo would not go forward with the Transaction.

b.  To induce Bonomo to go forward with the Transaction, Bekkedam told Bonomo that Levin had already purchased $5 million in Nova stock and that Levin's investment had improved Nova's capitalization status.  This statement was materially false and misleading at the time it was made because Bekkedam knew then that, if they knew Levin's stock purchase was made from Nova loan proceeds, bank regulators would not consider the investment to be capital. Bekkedam knew that, if he told Bonomo the truth – that Levin's investment in Nova with proceeds from a Nova loan was not considered capital – Bonomo would not go forward with the Transaction.

c.  To induce Bonomo to go forward with the Transaction, Bekkedam told Bonomo that, if he purchased $2.5 million in Nova stock through the June Offering that Nova would be able to go forward with its Proposed Acquisitions of DVFG and AFC.  This statement was materially false and misleading at the time it was made because Bekkedam knew then that DVFG had terminated the Nova-DVFG merger agreement in July 2009.   Bekkedam knew that, if he told Bonomo the truth – that DVFG had already terminated the merger agreement – Bonomo would not go forward with the Transaction.  This statement was also materially false and misleading for the additional reason that Bekkedam knew then that Levin would not be following through with his commitment to purchase $13 million in Nova stock through the June Offering and, therefore, there would be insufficient proceeds from the offering to go forward with the Proposed Acquisition of AFC.  Bekkedam knew that, if he told Bonomo the truth – that

Levin would not be following through with his $13 million commitment – Bonomo would not go forward with the Transaction.

        d.   To induce Bonomo to go forward with the Transaction, Bekkedam told Bonomo that Levin was committed to purchasing $13 million in Nova stock through the June Offering and that Levin's investment would enable Nova to alleviate its undercapitalization problems and satisfy its regulatory requirements.  This statement was materially false and misleading at the time it was made because Bekkedam knew then that Rothstein's Ponzi scheme was collapsing and that Levin would be unable to make any further investment in Nova. Bekkedam did not tell Bonomo that Banyon was a feeder fund for Rothstein's Ponzi scheme that had collapsed or was on the verge of collapsing, that any further investment in Banyon would be worthless, and that Levin would not be purchasing any Nova stock in the June Offering. Bekkedam knew that, if Bonomo knew this information, he would not go forward with the Transaction.

        60.    On or about October 26 or 27, 2009, Bekkedam provided Bonomo with a copy of the June PPM.   Bekkedam and Nova had a duty to update the following representations made in the June PPM  based on information they knew as of October 26, 2009, but they failed to do so.

        a.   The June PPM stated that purpose of the June offering was, among other things, to increase Nova's capital ratios for regulatory compliance and to finance the Proposed Acquisitions of DVFG and AFC.  (*See* Exh. I, June PPM at 2, 25, 31-32.)  By October 26, 2009, Bekkedam and Nova knew that DVFG had already terminated the Nova-DVFG merger agreement; that, without a $13 million investment by Levin, Nova would not be able to increase Nova's capital ratios for regulatory compliance or to finance the Proposed Acquisition of AFC;

and that any purchases of Nova stock with Nova loan proceeds would not constitute capital and, therefore, could not alleviate Nova's capitalization problems.  Bekkedam and Nova did not update the June PPM with this information because they knew that, if Bonomo knew this information, he would not go forward with the Transaction.

    b. The June PPM also stated that, as of March 31, 2009, Nova had total assets in the amount of approximately $647.3 million, net income in the amount of $60 thousand, and $32.9 million in shareholders' equity.  (*See* Exh. I, June PPM at 40, 42, 43.)  Because Nova had closed its books and prepared its consolidated financial statements for the quarter ending September 30, 2009 before October 26, 2009, Bekkedam and Nova knew that Nova's financial statements for the quarter ending September 30, 2009 reported a $7.3 million loss instead of the $60 thousand in net income that was reported in the June PPM, and that the $7.3 million loss primarily arose out of the bank regulators requiring Nova to write down $4.4 million in assets and increase the provision for loan losses by $3.8 million.  Moreover – despite Levin's purported $5 million in Nova stock on June 30, 2009 – its stockholders' equity had dropped from $33 million to $29.7 million.   (*See* Exh. J, November PPM at 39-46.)  Bekkedam and Nova did not update the June PPM with this information because they knew that, if Bonomo knew this information, he would not go forward with the Transaction.

    61. On Thursday, October 29, 2009, Bekkedam's told Levin in an email message that he was "rattle[d]" by the collapsing Rothstein Ponzi scheme.  (*See* Exh. G, Oct. 29, 2009 email from B. Bekkedam to G. Levin.)

    62. At no time between October 26, 2009 and October 30, 2009, did Bekkedam or Nova provide Bonomo with the information delineated in paragraphs 59-60 above.

63.     Bonomo did not contact Nova Bank to seek a loan; instead, Bekkedam made arrangements with Nova Bank to loan Bonomo $4.5 million (the "Loan").  Bekkedam convinced Bonomo to take the Loan and to sign the subscription agreements in connection with the June PPM.

64.     The Loan closing occurred by fax and mail on or about October 30, 2009. $2 million of the Loan proceeds were wired to a Banyon escrow account the next day while the balance of the Loan proceeds were transferred to Nova Bank to fund Plaintiffs' subscription for Nova Holdings shares.

65.     On Friday, October 30, 2009, Plaintiffs signed the June Offering subscription agreement.  Plaintiffs invested $2.5 million for Nova Holdings' shares at $11 per share.

66.     Also on October 30, 2009, the June Offering closed.

67.     Beginning on Saturday, October 31, 2009, the day after the June Offering closed, the media widely reported the news of Rothstein's Ponzi scheme and its collapse.  *See, e.g.*, Norman, Bob, *Talk of the Town: Scott Rothstein (UPDATED)*, New Times Broward-Palm Beach, Oct. 31, 2009 (reporting that there was "a huge amount of money missing from investors," "Rothstein [was] reportedly in Morocco," his law firm was "toast" and would be "disbanding"), http://blogs.browardpalmbeach.com/pulp/2009/10/scott_rothstein_call_me_where.php; Norman, Bob, *Kendall Coffey: Law Firm Victimized By Scott Rothstein*, New Times Broward-Palm Beach, Nov. 1, 2009, http://blogs.browardpalmbeach.com/pulp/2009/11/kendall_coffey_scott_rothstein.php.

68.     On Monday, November 2, 2009, Rothstein's law firm, RRA, filed a Complaint for Dissolution and for Emergency Appointment of a Receiver, http://online.wsj.com/public/resources/documents/110209Rothsteinmotion.pdf.

69.     The June Offering raised only $5.3 million out of the total of $29.7 million that Nova and Bekkedam sought to raise.  Plaintiffs' $2.5 million investment represented almost 50% of the stock sold in the June Offering.

70.     It was not until **after** the close of the June Offering and Bonomo's investment in the June Offering, that Bekkedam told Bonomo that Plaintiffs' investment in Banyon was worthless, that Nova had suffered significant losses, that Nova could not make the Proposed Acquisitions, and that Nova needed to raise significant new equity.

## The November Offering

71.     Seventeen days after the closing of the June Offering, Nova began a new stock offering (the "November Offering") pursuant to a Confidential Private Placement Memorandum dated November 16, 2009 (the "November PPM").

72.     In the November Offering, Nova offered to sell up to 2 million shares at $4.00 per share (over 60% less than the June Offering price), the purpose of which was to satisfy the conditions for a separate issuance of its preferred stock to the United States Treasury under its "TARP" program for $17 million.  (*See* Exh. J, November PPM at 1.)

73.     The November PPM, unlike the June PPM, characterized Nova's financial condition as weak, stating, *inter alia*, that as of September 30, 2009, Nova had total assets in the amount of approximately $614.9 million (down from the $647.3 million in assets reported in the June PPM), a net loss in the amount of $7.3 million (a significant drop from the $60 thousand in net income reported in the June PPM), and $29.7 million shareholder's equity (down from the $33 million reported in the June PPM).  The November PPM also stated that Nova had

experienced a significant increase in non-performing loans and assets and a $20.6 million

unrealized loss.  (*See* Exh. J, November PPM at 39-46.)

74.     The November PPM also disclosed that the $7.3 million loss primarily

arose out of the bank regulators requiring  Nova to write down $4.4 million in assets and increase

the provision for loan losses by $3.8 million.  (*See id.* at 39, 41.)

75.     The November PPM further disclosed that "NOVA recently learned that

one large investor, who had subscribed for an amount of shares that would have enabled NOVA

its capital commitment contingency with Treasury, is unable to fulfill his subscription obligation

for reasons beyond his control."  (*See* Exh. J., November PPM at 2.)

76.     The November Offering made no mention of the DVFG and AFC

acquisitions, which, of course, never occurred.  Indeed, to this day, Nova has not disclosed that

DVFG terminated the Nova-DVFG merger agreement in July 2009.

77.     The November Offering also failed to disclose the fact that Levin's $5

million purchase and Bonomo's $2.5 million purchase of Nova stock were not considered

capital.  Indeed, to this day, neither Bekkedam nor Nova has advised Bonomo that his investment

did not improve Nova's undercapitalization problem.  It was not until Nova's consolidated

financial statements for 2009 and 2010 were audited, that its attempt to defraud the banking

regulators with such Nova-financed stock purchases was disclosed.   (*See* Exh. K, Note 4, part R

of Nova's audited consolidated financial statements for 2009 and 2010.)  These financial

statements reveal that Nova's stockholders' equity a mere $1.8 million in 2009, and only $13.3

million in 2010.  (*See id*.)  The statements further explain that Nova Bank's loans to Nova

shareholders, including the $2.5 million loan to Bonomo and the $5 million loan to Levin,

resulted in significant reductions in Nova Holdings' stockholders' equity.  (*See id*.)

78.     The November PPM further noted that there was no assurance that the Treasury would complete the purchase of the senior cumulative preferred stock.

### Bekkadam Acted At All Material Times As Nova's Agent

79.     At all relevant times, Bekkedam was acting on behalf of Nova, and his statements and omissions can be attributed to Nova.  Specifically Bekkedam:

        a.      was the original Chairman of Nova Holdings and Nova Bank;

        b.      personally raised all of the equity for Nova Holdings;

        c.      negotiated the proposed DVFG and AFC acquisitions;

        d.      regularly met with and talked to Hartline and DiMarcantonio about Nova matters;

        e.      maintained his personal and Ballamor accounts at Nova Bank;

        f.      arranged for Levin to invest $5 million into Nova and to subscribe for an additional $13 million as a *quid pro quo* for Bekkedam's raising $40 million for Levin's Banyon fund;

        g.      was the investment advisor for substantially all of Nova Holdings' investors;

        h.      was focused on protecting his clients' substantial investments in Nova which were jeopardized by the materially adverse financial performance of the Nova Bank, as well as bank regulatory action;

        i.      was concerned that the failure of Nova would destroy Ballamor;

        j.      solicited and was substantially involved in Plaintiffs' purchase of stock in the June offering; and

k.    orchestrated the Loan transaction with Plaintiffs without telling them that their use of the Loan proceeds in an investment in Nova would not be considered capital by the bank regulators.

**Nova's Material Misrepresentations And Omissions**

80.    As Nova's agent, Bekkedam made the following misrepresentations to Bonomo on or about October 26, 2009:

a.    To induce Bonomo to go forward with the Transaction, Bekkedam told Bonomo that Nova Bank would loan him $4.5 million to cover both investments, and that, if he used $2.5 million of the loan proceeds to purchase Nova stock, his investment would increase Nova's capital and help alleviate its capitalization problems.  This statement was materially false and misleading at the time it was made because Bekkedam knew then that bank regulators would not consider Nova stock purchased with a Nova loan as capital.  Bekkedam knew that, if he told Bonomo the truth – that Bonomo's investment in Nova with proceeds from a Nova loan would not be considered capital – Bonomo would not go forward with the Transaction.

b.    To induce Bonomo to go forward with the Transaction, Bekkedam told Bonomo that Levin had already purchased $5 million in Nova stock and that Levin's investment had improved Nova's capitalization status.  This statement was materially false and misleading at the time it was made because Bekkedam knew then that, if they knew Levin's stock purchase was made from Nova loan proceeds, bank regulators would not consider the investment to be capital. Bekkedam knew that, if he told Bonomo the truth – that Levin's investment in Nova with proceeds from a Nova loan was not considered capital – Bonomo would not go forward with the Transaction.

c.    To induce Bonomo to go forward with the Transaction, Bekkedam told Bonomo that, if he purchased $2.5 million in Nova stock through the June Offering that Nova

-30-

would be able to go forward with its Proposed Acquisitions of DVFG and AFC.  This statement was materially false and misleading at the time it was made because Bekkedam knew then that DVFG had terminated the Nova-DVFG merger agreement in July 2009.   Bekkedam knew that, if he told Bonomo the truth – that DVFG had already terminated the merger agreement – Bonomo would not go forward with the Transaction.  This statement was also materially false and misleading for the additional reason that Bekkedam knew then that Levin would not be following through with his commitment to purchase $13 million in Nova stock through the June Offering and, therefore, there would be insufficient proceeds from the offering to go forward with the Proposed Acquisition of AFC.  Bekkedam knew that, if he told Bonomo the truth – that Levin would not be following through with his $13 million commitment – Bonomo would not go forward with the Transaction.

        d.   To induce Bonomo to go forward with the Transaction, Bekkedam told Bonomo that Levin was committed to purchasing $13 million in Nova stock through the June Offering and that Levin's investment would enable Nova to alleviate its undercapitalization problems and satisfy its regulatory requirements.  This statement was materially false and misleading at the time it was made because Bekkedam knew then that Rothstein's Ponzi scheme was collapsing and that Levin would be unable to make any further investment in Nova. Bekkedam did not tell Bonomo that Banyon was a feeder fund for Rothstein's Ponzi scheme that had collapsed or was on the verge of collapsing, that any further investment in Banyon would be worthless, and that Levin would not be purchasing any Nova stock in the June Offering. Bekkedam knew that, if Bonomo knew this information, he would not go forward with the Transaction.

81.     On or about October 26 or 27, 2009, Bekkedam provided Bonomo with a copy of the June PPM.   Bekkedam and Nova had a duty to update the following representations made in the June PPM  based on information they knew as of October 26, 2009, but they failed to do so.

a.   The June PPM stated that purpose of the June offering was, among other things, to increase Nova's capital ratios for regulatory compliance and to finance the Proposed Acquisitions of DVFG and AFC.  (*See* Exh. I, June PPM at 2, 25, 31-32.)  By October 26, 2009, Bekkedam and Nova knew that DVFG had already terminated the Nova-DVFG merger agreement; that, without a $13 million investment by Levin, Nova would not be able to increase Nova's capital ratios for regulatory compliance or to finance the Proposed Acquisition of AFC; and that any purchases of Nova stock with Nova loan proceeds would not constitute capital and, therefore, could not alleviate Nova's capitalization problems.  Bekkedam and Nova did not update the June PPM with this information because they knew that, if Bonomo knew this information, he would not go forward with the Transaction.

b.   The June PPM also stated that, as of March 31, 2009, Nova had total assets in the amount of approximately $647.3 million, net income in the amount of $60 thousand, and $32.9 million in shareholders' equity.  (*See* Exh. I, June PPM at 40, 42, 43.)  Because Nova had closed its books and prepared its consolidated financial statements for the quarter ending September 30, 2009 before October 26, 2009, Bekkedam and Nova knew that Nova's financial statements for the quarter ending September 30, 2009 reported a $7.3 million loss instead of the $60 thousand in net income that was reported in the June PPM, and that the $7.3 million loss primarily arose out of the bank regulators requiring Nova to write down $4.4 million in assets and increase the provision for loan losses by $3.8 million.  Moreover – despite Levin's purported

$5 million in Nova stock on June 30, 2009 – its stockholders' equity had dropped from $33 million to $29.7 million.   (*See* Exh. J, November PPM at 39-46.)  Bekkedam and Nova did not update the June PPM with this information because they knew that, if Bonomo knew this information, he would not go forward with the Transaction.

82.     In fact, as finally revealed in Nova's audited financial statements for 2009 and 2010, Nova Bank's $5 million loan to Levin and $2.5 million loan to Bonomo were deducted from Nova's stockholders' equity.  (*See* Exh. K, Note 4, part R of Nova's audited consolidated financial statements for 2009 and 2010.)

83.     Nova, Hartline, and DiMarcantonio were aware of Bekkedam's material misstatements and omissions to Bonomo, as well as the material misstatements in the June PPM.

84.     The facts withheld by Nova and Bekkedam are information a reasonable investor would have wanted to know prior to making an investment.

85.     Plaintiffs would not have purchased any shares of Nova but for Nova and Bekkedam's material misrepresentations and omissions.

86.     On August 21, 2010, Plaintiffs' counsel sent a letter to Hartline demanding a rescission of Plaintiffs' investment in Nova.  Nova rejected this demand.

**COUNT ONE**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**

87.     Plaintiffs incorporate by reference paragraphs 1-86, as fully set forth herein.

88.     Nova intended that Plaintiffs rely upon statements in the June PPM and statements made by Bekkedam on behalf of Nova.

89.     Plaintiffs did reasonably rely on such statements and were damaged as a result.

90.     Bekkedam, acting on behalf of and at the insistence of Nova, made misrepresentations to Plaintiffs that resulted in Plaintiffs obtaining the Loan from Nova Bank for the purpose of purchasing stock for the June Offering.

91.     Bekkedam made these intentional misrepresentations to Plaintiffs with the express, implied, inherent and/or apparent authority of Nova, and therefore, Nova is bound by his statements.

92.     Further, Nova ratified the fraudulent acts of Bekkedam by loaning moneys to Plaintiff and accepting the benefits of his false promises to the investors, namely, accepting Plaintiffs' funds.

93.     The law does not allow Nova to accept the benefits of the fraudulent conduct that allowed them access to the investors' funds, and at the same time, avoid liability created by the misrepresentations that induced the investors to act.

94.     The misrepresentations and omissions identified above were made in connection with the sale of securities by Nova to Plaintiffs, and in so doing, Nova employed the means and instrumentalities of interstate commerce and communication.

95.     Bekkedam and Nova acted with *scienter* in making the foregoing misrepresentations and omissions.

96.     Bekkedam and Nova intended that the Plaintiffs rely, and the Plaintiffs did reasonably rely, on the misrepresentations made on behalf of Nova, and were damaged as a result.

97.     Therefore, Nova, in connection with the purchase or sale of securities and in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder:

        a.     employed a device, scheme, or artifice to defraud Plaintiffs;

    b.  made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under with they were made, not misleading; and

    c.  engaged in acts, practices, or courses of business that operated or would operate as a fraud or deceit upon Plaintiffs, in connection with the purchase or sale of a security.

   98.  Nova's misrepresentations and omissions, as detailed above, were material.

   99.  As a direct and proximate result of Nova's conduct, Plaintiffs were damaged.

   100.  All of the above acts were in violation of federal law is liable to Plaintiffs for damages caused by the violations.

   WHEREFORE, Plaintiffs demand that judgment be entered in their favor against Nova, as follows:

   (1) a determination that Plaintiffs' subscription to the June Offering is rescinded and an order directing Defendant to pay restitution to the Plaintiffs in the amount of $2.5 million plus interest;

   (2) for compensatory damages in an amount in excess of $2.5 million, together with interest, penalties, treble damages, costs of suit, counsel fees and other such relief as this Court deems just, proper and equitable.

## COUNT TWO
### Common Law Fraud

101.    Plaintiffs incorporate by reference paragraphs 1-100, as if fully set forth herein.

102.    Nova made multiple false or misleading statements in the information that they provided to Plaintiffs in order to induce Plaintiffs to invest in Nova.

103.    Nova made these misrepresentations knowing they were false and/or with reckless or negligent disregard for their truth.

104.    Nova intended Plaintiffs to rely upon its misrepresentations.

105.    Plaintiffs, relied upon the misrepresentations made to them, which reliance caused injury to Plaintiffs.

106.    As a result of the fraud, Nova is liable to Plaintiffs for the full amount of the damages they have incurred plus punitive damages.

WHEREFORE, Plaintiffs demand that judgment be entered in their favor against Nova, as follows:

(1) a determination that Plaintiffs' subscription to the June Offering is rescinded and an order directing Defendant to pay restitution to the Plaintiffs in the amount of $2.5 million plus interest;

(2) for compensatory damages in an amount in excess of $2.5 million, together with interest, penalties, treble damages, costs of suit, counsel fees and other such relief as this Court deems just, proper and equitable.

## COUNT THREE
## Breach of Fiduciary Duty

107.    Plaintiffs incorporate by reference paragraphs 1-106, as if fully set forth herein.

108.    As Bonomo's primary investment advisor, Bekkedam had substantial influence over Bonomo's investment decisions, and Bonomo relied on and trusted Bekkedam's investment advice.  Consequently, Bekkedam had the ability to compel Bonomo to engage in unusual investment transactions.

109.    At all material times, Nova Holdings' president and CEO, Brian Hartline, and Chairman, Edward DiMarcantonio, who were Bekkedam's close friends, encouraged and expected Bekkedam to use his considerable influence over his clients to steer them to invest in Nova.  Indeed, before Bonomo purchased Nova stock, more than half of Nova's shareholders were Bekkedam's clients.  And even *after* Bekkedam's involvement in Rothstein's scam was publicly revealed and Ballamor folded, Nova paid Bekkedam $250,000 upfront to steer investors to purchase Nova Holdings stock.

110.    "In short, Bekkedam was a 'huge' and 'constant' source of business for [Nova], 'whether it was deposits or loans or investments.' . . . Bekkedam used his position as an investment advisor to control investors and benefit [Nova]."  (Exh. A, *Musser* Compl. ¶ 16; Exh. C, DiMarcantonio Dep. Tr. at 29, 31-32, 103.)  Beginning on or about October 26, 2009, Bekkedam, acting as Nova's agent, took advantage of his special, confidential relationship with Bonomo and induced him to take a $4.5 million loan from Nova Bank and, with $2.5 million of the loan proceeds, purchase stock in Nova Holdings.

111.    At all material times, Nova knew or should have known that Bonomo was placing his trust and confidence in Nova and Bekkedam, as Nova's agent, and that it had a duty

to act in good faith, to deal fairly and openly toward Bonomo, and to refrain from using its superior position to Bonomo's detriment.

112.    As Bonomo's fiduciary, Nova owed him the utmost duty of loyalty and good faith and were required to act solely for his benefit.

113.    Instead, Bekkedam and Nova intended that Bekkedam's conduct in inducing Bonomo to borrow $4.5 million from Nova Bank and invest $2.5 million of the loan proceeds in Nova Holdings stock would benefit, and did substantially benefit, Nova at Bonomo's expense.  Nova ratified Bekkedam's conduct by knowingly accepting the benefits thereof.

114.    Nova breached its fiduciary duties to Bonomo by compelling him to engage in the unusual transaction of borrowing $4.5 million from Nova Bank for the express purpose of investing $2.5 million in Nova Holdings stock and $2 million in Banyon.  As of October 26, 2009, when Bekkedam first began making the material misrepresentations and omissions, delineated above, to induce Bonomo to engage in this transaction, Bekkedam, Hartline and  DiMarcantonio each knew or were reckless in not knowing that, but for these material misrepresentations and omissions, Bonomo would not have engaged in this transaction, and that the transaction would benefit Nova and cause substantial financial loss to Bonomo.

115.    As a proximate result of Nova's breach of its fiduciary duties, Bonomo has suffered damages in excess of $2.5 million.

WHEREFORE, Plaintiffs demand that judgment be entered in their favor against Nova, as follows:

(1) a determination that Plaintiffs' subscription to the June Offering is rescinded and an order directing Defendant to pay restitution to the Plaintiffs in the amount of $2.5 million plus interest;

(2) for compensatory damages in an amount in excess of $2.5 million, together with interest, costs of suit, counsel fees and other such relief as this Court deems just, proper and equitable.

### COUNT FOUR
### Unjust Enrichment

116.    Plaintiffs incorporate by reference paragraphs 1-115 as if fully set forth herein.

117.    Plaintiffs invested in Nova based on the misrepresentations about Levin's investments, the Proposed Acquisitions and Nova's financial health contained in the June PPM, the misstatements made by Bekkedam on Nova's behalf, and loan from Nova Bank orchestrated by Bekkedam.

118.    Nova knew that the only reason Plaintiffs invested in Nova was the misrepresentations and omissions made by Nova.

119.    Nova knew that Levin was not going to invest in it, that Plaintiffs' investment in Nova would not improve its capitalization, and that Nova's financial condition had declined significantly since the issuance of the June PPM, but Nova withheld this information from Plaintiffs.

120.    Unaware of the changed circumstances, Plaintiffs invested $2.5 million in Nova.

121.    Plaintiffs demanded a return of those funds when they learned of Nova's misrepresentations.

122.    Nova has wrongfully refused to return Plaintiffs' funds.

123.    Nova has taken monies from Plaintiffs for its use and benefit, to the detriment of Plaintiffs.

124.    By retaining Plaintiffs' funds, Nova has been unjustly enriched and allowing it to retain such funds would be unjust and inequitable.

WHEREFORE, Plaintiffs demand that judgment be entered in their favor against Nova, as follows:

(1) a determination that Plaintiffs' subscription to the June Offering is rescinded and an order directing Defendant to pay restitution to the Plaintiffs in the amount of $2.5 million plus interest;

(2) for compensatory damages in an amount in excess of $2.5 million, together with interest, costs of suit, counsel fees and other such relief as this Court deems just, proper and equitable.

Respectfully submitted:

*s/ Michael S. Hino*
Michael S. Hino
PEPPER HAMILTON LLP
400 Berwyn Park
899 Cassatt Road
Berwyn, PA 191312-1183
(610) 640-7800

Gay Parks Rainville
Deirdre E. McInerney
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

Dated:  July 16, 2012                    Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I, Gay Parks Rainville, hereby certify that on July 16, 2012, I caused a true and correct copy of the foregoing Amended Complaint to be filed electronically and to be served upon the following counsel for defendants via ECF and electronic mail:

Joshua Horn, Esquire
Fox Rothschild LLP
2000 Market ST., 10th Floor
Philadelphia, PA 19103
215-299-2184
Fax: 215-299-2150
Email: jhorn@foxrothschild.com

Amit Shah, Esquire
Fox Rothschild LLP
2000 Market ST., 10th Floor
Philadelphia, PA 19103
Email: ashah@foxrothschild.com

Ernest Edward Badway
Fox Rothschild LLP
100 Park Ave, Suite 1500
New York, NY 10017
212-878-7900
Fax: 212-692-0940
Email: ebadway@foxrothschild.com

/s/ Gay Parks Rainville
Gay Parks Rainville